Bealey v. Blake.

---

BEALEY et al. v. BLAKE et al., Appellants.

Division One, February 5, 1900.

| 153 | 657 |
| 158 | 518 |

| 153 | 657 |
| 93a | 515 |

| 153 | 657 |
| 169 | 560 |

| 153 | 657 |
| 102a | 411 |

1. **Dower:** ACCEPTANCE OF DEED: BARRED BY CONSENT. The wife's dower in her husband's lands can not be barred except by her express agreement or by reason of her accepting a conveyance of lands in which it is clearly expressed that it is granted and accepted in lieu of dower. And an acceptance by her of a voluntary warranty deed to a part of her husband's lands, in which there is no recital of a relinquishment of dower, is no evidence of her consent or agreement to relinquish dower in the rest of the land.

2. ————: RELINQUISHMENT: IMPLIED CONSIDERATION. When a wife joins her husband in a deed and relinquishes her dower, it is implied that a portion of the actual consideration represents the value of her dower interest.

3. ————: SETTING ASIDE DEED: REVIVAL. A voluntary deed, without consideration, when set aside as to the husband, is also set aside as to his wife who joined therein, and her dower is revived.

4. ————: ————: DECREE OF TITLE. Where a court sets aside a deed made by the husband in his lifetime and decrees title in his children, his widow's dower is not thereby extinguished, if she is not a party to the suit. Her dower in such case is exactly the same as it would have been had her husband died the owner of the land.

5. **Homestead:** ABANDONMENT. A husband and his wife, with whom he had lived amicably for thirty years, moved from his homestead on account of threats from his tenants and danger to his life. She went to her daughter's and he, broken in health, visited his son in Kansas and some friends in Oklahoma. In October he made a deed to the land in controversy, which the court set aside after his death as being the act of an insane and weak-minded man. He returned to Missouri to vote in November, then on account of bad health vis-

Bealey v. Blake.

ited his daughter in Louisiana, and in February wrote that he would never spend another day among the "Christian thieves and religious robbers of Missouri." This was the only evidence of his intention to abandon his homestead. He died in Louisiana in March. *Held*, that he had not abandoned his homestead.

6. ———: ———: PLEADINGS. Unless the abandonment of homestead is pleaded, the question is not legitimately before the trial court for determination.

Appeal from Buchanan Circuit Court.—*Hon. A. M. Woodson*, Judge.

REVERSED AND REMANDED.

*J. M. Stewart, Harry J. Nelson* and *C. A. Mosman* for appellants.

(1) The alleged contract in release of dower is not sustained by any direct evidence. No agreement or writing of any kind, signed by appellant to that effect is shown. No witness swears to any such oral agreement on her part. All that appears is these two conveyances, which are in the form commonly used in real estate transactions, and contain not the slightest suggestion that the appellant herein purposed or intended by the acceptance of said deed, to relinquish her dower in other lands not mentioned or described. Indeed, it is not even shown that she was present when these conveyances were made. (2) No purpose or intention on the part of her husband that the property thus conveyed was to be in lieu of dower in his other land is shown. On the contrary the plaintiffs themselves prove by the decree introduced in evidence by them that these conveyances were not the acts and deeds of said Norton Blake; that he was too weak minded and demented to be capable of forming such a purpose or intention; and that he was then subject to a strong and controlling influence of his son-in-law, William Bealey, who was his trusted agent and confidential business adviser. Such evidence is a sufficient answer to the alleged contract. 1 Greenl. on Evid., sec. 33; Hall v. Smith, 103 Mo. 295; Pemberton v.

Pemberton, 29 Mo. 408; Martien v. Norris, 91 Mo. 455; Bryant v. McCune, 49 Mo. 547; Perry v. Perryman, 19 Mo. 469; Farris v. Coleman, 103 Mo. 360; Dudley v. Davenport, 85 Mo. 462. (3) We contend that Mrs. Blake is entitled to dower in these lands; there is nothing in the record which tends to show that Norton Blake left the place with an intention to abandon his homestead. He was driven from it by fear of his life. The record shows many acts of violence on the part of the tenants towards him; that an altercation occurred nearly every day; that they tried to burn his granary, and that Robert Young was afraid the old man would be killed and got him to come to his house to live until the trouble was over. Blake left his things on the place and went to Young's within a mile of his homestead to live temporarily. Under such circumstances no inference of an intention to abandon the homestead can be indulged. Leak v. King, 85 Mo. 413; Potts v. Davenport, 79 Ill. 455; Harberson v. Jenninson, 38 S. W. Rep. 232; Farmer v. Hale, 37 S. W. Rep. 164; Wetzs v. Board, 12 Oh. St. 431; Brown v. Brown, 68 Mo. 388; Whitehead v. Tap, 69 Mo. 415; Dufey v. Williams, 99 Mo. 135; Walters v. The People, 21 Ill. 178; Rohrer v. Brockhage, 13 Mo. App. 402; Shores v. Shores, 34 Mo. App. 208; Harberson v. Jenninson, 38 S. W. Rep. 232; Farmer v. Hale, 37 S. W. Rep. 164; Locke v. Rowell, 47 N. H. 50. (4) The wife is compelled to follow her husband and is in as much need of protection in the preservation of her homestead as are the children, and the same law should apply to both. · Walters v. The People, 21 Ill. 178; Rohrer v. Brockhage, 13 Mo. App. 404; s. c., 86 Mo. 547; Hofschmidt v. Gross, 112 Mo. 658.

*Ben. J. Woodson, Thos. J. Porter, Frank Hagerman* and *Willard P. Hall* for respondents.

(1) The decree had the double effect (a) of divesting Bealey of the title to the land, and (b) of vesting it in the

three designated children of Norton Blake. This as effectually as if the decree had compelled a conveyance by Bealey to them. In a certain sense this decree was binding upon no one but the parties to it, but in another sense it is binding upon all the world. Had Bealey voluntarily, or under the compulsion of a decree, conveyed the land to said three children, no one but the parties would have been absolutely concluded thereby, but on the other hand all the world would have been concluded until such conveyance should have been set aside and canceled in a proper proceeding instituted for that purpose. And so it is with the present decree. It vested all of Bealey's title in said children. That title was good against everybody except them, for no one else had attacked it. That title will continue good, and will continue in the children so long as the decree continues in force, and it will continue in force until set aside and canceled. (2) The widow can have no interest in the land until in an action by herself she shall have set aside the conveyances to Gilbert Blake and by him as aforesaid. Those conveyances are still subsisting as to her. So long as they stand, she has no title or interest whatever. (3) Can she keep the forty acres and also get a dower in the other land? If there was fraud, she knew it and was a party to it, and equity will not relieve her. If the husband was of unsound mind she knew that also, and equity will not help her on that score so long as she holds onto the forty acres. And besides all that, she knew well enough what she was doing. She released her dower. She was not defrauded. She can not now get it back. There is no conceivable ground on which a court of equity will give her back her dower. It is no answer to all this for counsel to say that when a deed of a man joined in by his wife is set aside on account of his fraud she will take her dower as if the conveyance had not been made. (a) Because the deed here has never been set aside except in the suit which resulted in the decree in favor of the three children, and the widow is not claiming under that

decree. (b) Because here the fraud was hers, and she profited by it to the extent of forty acres which she still retains.

MARSHALL, J.—This is an action for the partition of one hundred and sixty-six and one-half acres of land in Buchanan county. Originally the parties to the suit were only Gertrude Bealey (and her husband), the plaintiffs, and J. J. Blake and Lucy E. Snyder, the defendants, who were the children of A. N. Blake—usually called Norton Blake. Afterwards Mary Blake, the widow of Norton Blake, and Samuel H. Smith, the public administrator in charge of the estate of Norton Blake, were on their motions made parties defendant.

The plaintiffs asked partition by giving to each of the children an equal one-third of the property. The defendants J. J. Blake and Lucy E. Snyder also claimed that the three children were entitled to one-third each, but they asserted that the plaintiffs had collected the rents since January, 1890, amounting to some four thousand dollars, had appropriated them to their own use and had excluded said defendants from the enjoyment of the premises, and they therefore asked that two-thirds of said rents, less the taxes paid by the plaintiffs, be charged against the plaintiffs' interest.

The answer of Smith, the administrator, averred that the administration upon the estate had not been closed; that there was no personal property belonging to the estate, and no other real estate; that there were judgments and claims allowed against the estate, and that this real estate, or a part of it, would necessarily have to be sold to pay the same.

The answer of Mary Blake alleged that the land sought to be partitioned was the homestead of Norton Blake at the time of his death; that she is the widow of Norton Blake and has never remarried, and claimed a homestead and dower in the land. To this answer the plaintiffs replied, denying generally the allegations of the answer, and pleading specially that on

the 16th of April, 1890, Mary Blake joined in a deed with her husband conveying the land to Gilbert Blake, whereby she expressly released all claims to dower in the land; and further averring that on the 4th of October, 1890, "the transaction between Norton Blake and Gilbert Blake which had resulted in the execution of said deed, was so settled and arranged between said parties, that Gilbert Blake agreed to convey all of said lands to such person or persons as Norton Blake might designate. That then and there it was agreed between Norton Blake and Mary Blake, his then wife, that Gilbert Blake should convey a portion of said lands included in the deed from Norton Blake to Gilbert Blake, about forty-six acres in amount, to Mary Blake and that in consideration thereof, and of the further conveyances of Matthias Knaebel and his wife, of certain other lands to Mary Blake on the same day, which had been conveyed by Norton Blake and Mary Blake to said Knaebel, for the purpose of reconveyance to Mary Blake, said Mary Blake would and did release all right, claim or interest in or to any of the other lands included in said deed from Norton Blake to Gilbert Blake, and in consideration of the foregoing said Mary Blake did then and there consent to the conveyance by said Gilbert Blake of the remaining lands to William Bealey, which said remaining lands thus conveyed to William Bealey, are the subject of this suit."

The trial developed the following state of facts:

The plaintiff Gertrude Ecaley and the defendants Judson J. Blake and Lucy E. Snyder, are the children of Norton Blake by his first marriage. About 1866, Norton Blake married Mary Thompson, the widow of George Thompson, and she had one child by that marriage, now the wife of Robert Young. At the time of his death George Thompson owned lot 16 in block 9, of south St. Joseph. Mary, at the time of her marriage to Blake, owned the east half of the southeast quarter of section 3, township 21, range 36, in Andrew county.

Afterwards, in 1868, Norton Blake and Mary, his wife, conveyed this land to one Mooney for an expressed consideration of $5,000.

From the time of their marriage in 1866 until March or April, 1890, Norton Blake and Mary his wife lived upon the premises here sought to be partitioned, and there is no dispute that it was his homestead. He and his wife always lived happily together and are not shown to have had any disagreements whatever. From the time of his marriage until February, 1890, Blake had managed the lot in St. Joseph, which was so owned by Thompson before his death, and collected the rents therefrom, Blake wanted to make his stepdaughter, Mrs. Young, a present, and he therefore built a house on that lot, for which he paid thirteen hundred and fifty dollars, and Mrs. Young's husband paid the balance of the cost. Mrs. Young refused to accept any present or favor from Blake and declined to take the house. It was thereupon agreed that Mrs. Young and her husband should convey the lot to Norton Blake and he should convey it to Mary Blake. To carry out his purpose Mrs. Young and her husband conveyed the lot to Blake by deed dated February 8th, 1890. Norton Blake however did not carry out the programme at that time.

On the 1st of March, 1889, Blake leased his place, consisting of about two hundred acres, to Ball and Wattenberger for a term of ten years, reserving however the privilege of cancelling the lease at any time if he should sell the property, and further reserving for his own use two rooms in the mansion house and such other rooms in another house as should be necessary to store the household goods he wished to leave there, and also necessary room in the smokehouse, the south room in the wood house, "and the dwelling house in the grove 20 rods northwest of barn, and as much milk as he needs for his family use for butter, etc., and the use of the team known as Cub and Curly, and the use of such wagon or

vehicle as may be necessary, and also the right to build other buildings as he may think best, and all necessary privileges for the comfort of himself and family."

Afterwards on the 31st of August, 1889, Ball and Wattenberger assigned the lease to W. M. and Z. D. Patton. Blake and wife continued to live on the place after the execution of the lease and after its assignment. But there was serious trouble between Blake and the Pattons. They threatened to kill him and actually assaulted him. He was an old man, over seventy-five years of age, and he and his wife were terrorized by the Pattons, to such an extent that Blake employed persons to stay on the place to protect him and his wife. When these persons tired of the job and left, Blake sent for Mr. Young, and it resulted in Blake and his wife leaving the place in March or April, 1890, and going to Mr. Young's house.

On the 16th of April, 1890, Blake and his wife conveyed the land to Gilbert Blake, his nephew, for an expressed consideration of $20,000, but no such consideration was paid, but in fact, Gilbert Blake executed to Norton Blake certain promissory notes, aggregating $19,500, maturing at intervals of one year, the last falling due nineteen years after date, and secured them by a deed of trust on the land.

Some time in July, 1890, the difficulty between the Pattons and Blake was settled and the lease canceled. Then, on the 23d of July, 1890, Blake leased the land to one Overton for a term ending March 1st, 1894.

On the 4th of October, 1890, the transaction between Norton Blake and Gilbert Blake was rescinded, the notes given by Gilbert to Norton were surrendered and destroyed, and the deed of trust was released by Norton Blake and his wife Mary. Thereupon by direction of Norton Blake, one hundred and sixty-six acres of land, the premises here in question (and being a part of the premises conveyed to Gilbert by Norton Blake

and wife on April 16, 1890), were conveyed by Gilbert Blake and wife to William Bealey, the husband of Gertrude Bealey, the plaintiff herein.

On the same day Gilbert Blake and wife conveyed to Mary Blake, the defendant herein, forty-six acres of land (being the remainder of the land so conveyed to him on April 16th, 1890), subject to the Overton lease. A consideration of $4,000 was expressed in this deed but in fact it was a voluntary conveyance.

On the same day Norton Blake and wife conveyed the lot in St. Joseph, which formerly belonged to Mrs. Blake's first husband, George Thompson, and which Mrs. Young and her husband had conveyed to Norton Blake on the 8th of February, 1890, for the purpose of having him convey it to his wife, to Matthias Knaebel, and on the same day Knaebel and wife conveyed the same lot to Mary Blake. The consideration purported to be three thousand dollars, but in fact only one dollar was paid to Knaebel by Mrs. Blake, as he simply acted as the conduit for transferring the title from Norton Blake to his wife Mary Blake.

After these conveyances were made Mary Blake resided with her daughter Mrs. Young, and Norton Blake's health being poor, he visited his son in Kansas, and some friends in Oklahoma, but he returned to Buchanan county in November, 1890, for the express purpose of voting and did vote. Thereafter he again visited friends in Oklahoma, and later his son in Louisiana, where he died intestate on the 26th day of March, 1891. The evidence shows that at all times prior to, at least, February 23, 1891, he claimed Missouri as his residence and the land in question as his home and always expressed a determination to return to it.

On the 23d of February, 1891, however, he wrote a letter from his son's home in Louisiana to William Bealey, his son-in-law, in which he said: "I do not intend to ever spend

another day among the Christian thieves and religious robbers of Missouri, if I have to hire out and clean horses for my board in some livery stable."

After his death the probate court of Brown county, Kansas, granted letters of administration on his estate, and subsequently the probate court of Buchanan county, Missouri, directed the public administrator to take charge of his estate.

After his death J. J. Blake and Lucy E. Snyder instituted a suit in equity against William and Gertrude Bealey asking to have the deed, of April 16, 1890, from Norton Blake to Gilbert Blake, and the deed, of October 4, 1890, from Gilbert Blake to William Bealey set aside on the ground that they were procured by the fraud and undue influence of William Bealey on Norton Blake. This suit resulted in a decree, on June 22, 1895, setting aside those conveyances and vesting the title to the land in Gertrude Bealey, J. J. Blake and Lucy E. Snyder. In that decree the court finds that when those deeds were made "Norton Blake was weak in mind and body and weak-minded and demented and his mind was deranged," and that he was controlled by the undue influence of William Bealey, who caused him to execute the deed to Gilbert Blake and to direct Gilbert Blake to execute the deed to him (William Bealey) while he, Norton Blake, "was in such a demented, deranged, weak-minded and insane condition and while said Norton Blake was in such a demented, deranged, weak-minded and insane condition as not to understand or appreciate the nature and character of the transaction in which he was engaged, and by which he caused said deed to be made to said William Bealey, on account of the facts herein stated, was and is null and void."

At the request of Mrs. Mary Blake the court gave the following instructions:

"1. The court declares the law to be that there is no evidence tending to show that the deeds from Knaebel and wife and Gilbert Blake and wife to Mary Blake were made

in consideration of her relinquishment of her right to home-
stead in the land described in plaintiff's petition.

"3.    If the court finds from the evidence that the prem-
ises in controversy were the homestead of Norton Blake, and
that in consequence of the fear of personal violence and injury
he removed from his homestead to the house of his son-in-law,
Robert Young; that he was, on account of his age, infirmities
and the mental anxiety produced by his trouble with his
tenants, physically unable to take the charge and manage-
ment of the farm in July, 1890, when said tenants left; that he
then leased the farm to Overton and continued to make the
abode of himself and wife with his son-in-law while he was
visiting his children and friends in Kansas, Oklahoma and
Louisiana, and died in Louisiana while on a visit to his son in
the following March, and the court further finds that the said
Norton Blake acquired no new homestead elsewhere and de-
clared his intention to eventually return, and did intend to
return to and reside upon the old homestead, then the finding
shall be for the widow in respect to her claim of homestead
in said premises."

The court also gave on its own motion the following
declaration of law, consisting of a modification of a declaration
presented on behalf of defendant Mary Blake:

"2.    The transcript of the judgment of the probate court
of Brown county, Kansas, is not competent evidence in proof
of the fact that Norton Blake was a resident of Brown county,
Kansas.    But it is competent evidence for the purpose of
tending to prove such fact."

To the giving of which declaration, as modified by the
addition of the words after the second word "Kansas," de-
fendant Mary Blake at the time duly excepted.

Counsel for defendant Mary Blake also asked the court
to give the following declarations of law:

"1.    The court declares the law to be that the removal
of Norton Blake and wife from their old home and taking up

·their abode with their daughter, Mrs. Robert Young, if involuntary and brought about by fear of personal injury, would not prejudice the right of Mrs. Blake to a homestead.

"2'. If the court finds from the evidence that Norton Blake was physically unable, on account of his age and infirmities and the mental worry and anxiety produced by his troubles with the Pattons, to take the charge and management of the farm after the Pattons left in July, 1890, then the court declares the law to be that the fact that under such circumstances he leased said place to Overton and continued to make his abode with his son-in-law, Robert I. Young, while he was visiting his children and friends in Kansas, Oklahoma and Louisiana, would not justify the inference of an intention on his part to abandon his homestead or prejudice his widow's right thereto in this proceeding.

"3. There is no evidence tending to prove that at the date when Norton Blake removed from his old home and took up his abode with his son-in-law, Robert Young, he had formed the intention of abandoning his homestead in said premises.

"4. The court declares the law to be that defendant Mary Blake is entitled to dower in the land described in plaintiff's petition, notwithstanding the deeds mentioned in evidence as having been set aside by the decree attached to plaintiff's petition.

"5. The court declares the law to be that there is no evidence tending to show that the deeds from Knaebel and wife and Gilbert Blake and wife to Mary Blake were made in consideration of her relinquishment of dower in the remainder of her husband's property."

Which said five declarations of law the court refused to give, and counsel for Mrs. Blake properly saved exceptions.

The circuit court entered a decree partitioning the land equally between Gertrude Bealey, J. J. Blake and Lucy E. Snyder, and held that the administrator had no interest in the land, and was not a necessary party to the suit, and so dis-

missed the case as to him, and further held that Mrs. Mary Blake was not entitled to either homestead or dower in the land, and also refused to take into consideration or adjudicate the question of rents.

The plaintiffs and the administrator submitted to the decree. J. J. Blake and Lucy E. Snyder appealed on account of the refusal of the court to adjudicate the question as to the rents and profits as between them and their sister, Gertrude Bealey, but they have never perfected their appeal to this court and therefore that question does not present itself for adjudication in this case. Mary Blake appealed from the decree denying her homestead and dower rights and those are the only questions open to review in the present state of the record.

## I.

It will be observed that the only defense interposed to Mary Blake's claim to dower is that set out in the reply of the plaintiffs, which is, "that in consideration of the conveyance to her by Gilbert Blake of the forty-six acres of land, and of the conveyance by Norton Blake to Knaebel and by Knaebel to her of the lot in St. Joseph, which belonged to her first husband, she agreed to waive and did release all right, claim or interest in or to any of the other lands included in said deed from Norton Blake to Gilbert Blake, and in consideration of the foregoing said Mary Blake did then and there consent to the conveyance by said Gilbert Blake of the remaining lands to William Bealey, which said remaining lands thus conveyed to William Bealey are the subject of this suit."

No witness has testified to any such agreement in this case. The only testimony in the record that bears in any way upon the question is that of Mary Blake, wherein she expressly denied any such agreement, and this testimony was taken subject to objection and afterwards stricken out by the

court, and the further testimony of Robert Young that the lot in St. Joseph was deeded by him and his wife to Norton Blake on the express agreement that he should deed it to his wife. In addition to this, it is uncontradicted that this lot belonged to her first husband, and hence she and Mrs. Young owned it. Mrs. Young deeded her interest to Norton Blake on the agreement that he should deed it to her mother, his wife, which he did by mesne conveyances, but Mrs. Blake had an interest in the land all the time. This transaction may therefore be excluded from further consideration in this case. This leaves only the deed from Gilbert Blake to Mary Blake, of the forty-six acres to be considered. There is not one word in this deed which gives even an intimation of any such agreement. It is a plain warranty deed. Nothing is said about a relinquishment of dower.

An exactly similar condition was present in Martien v. Norris, 91 Mo. 465, where a stranger at the direction of the husband made an absolute conveyance of real estate to the wife, which did not recite that it was to be in discharge of dower, and afterwards the husband's will devised certain personalty to her, but said nothing about the realty and this court, speaking through BRACE, J., held that the deed to her "did not have the effect of creating an estate of jointure, which she was by law required to renounce in order to have her right of dower in such real estate. R. S. (1879) secs. 2201, 2202; Perry v. Perryman, 19 Mo. 469; Dudley v. Davenport, 85 Mo. 462......The recital in the will was no evidence by which plaintiff's absolute title in fee simple in the real estate conveyed to her by the deed of a stranger could be converted into an estate of jointure, and the deed and will, together or separately, evidenced no such provision made for the wife, out of the estate of the husband, as required a renunciation of the provisions of the will of her husband, in order that she might enjoy her right of dower in the real estate of which he died seized, and the circuit court, in this case, cor-

rectly held that plaintiff had right of dower in the real estate purchased by the defendant." In Farris v. Coleman, 103 Mo. l. c. 360, BLACK, J., quoted approvingly what was said by SCOTT, J., in Perry v. Perryman, 19 Mo. 469, when after speaking of the diversity of opinion under the English statutes he said: "Under this state of things, our statute was enacted which, unlike the Act of 27, Henry VIII, required that the provision made for the wife, if designed to exclude her from dower, to put her to an election, should be expressed to be in full discharge of all her claims of dower. We are warranted, then, in the conclusion, that our statute was worded, as it is, in order to dry up this source of litigation."

The statutes of this State (sec. 4525, R. S. 1889), expressly provide that no act of the husband shall bar the dower of the wife without her consent. The reason of all which is that dower is an interest in land created by law for the benefit of the wife, and it can not be barred except by her express consent or by some unequivocal act done by her from which her consent is necessarily implied; that is, by her express agreement or by reason of her accepting a conveyance of land in which it is clearly expressed that it is granted and accepted in lieu of dower.

The deed to Mrs. Blake contains no such provision. By accepting it she can not be said to have done an act from which an intention or agreement to relinquish her dower must necessarily be implied. The only defense pleaded to Mrs. Blake's right to dower therefore fails for lack of any evidence to support it, and the circuit court erred in not so holding. That court for the same reason erred in refusing to give the fifth instruction asked by Mrs. Blake, declaring that there was no evidence tending to prove that the deeds to Mrs. Blake were made in consideration of her relinquishment of dower in the remainder of her husband's property.

## II.

It is, however, contended that Mrs. Blake expressly waived her dower in the land in suit, by joining with her husband in the deed to Gilbert Blake, and that notwithstanding that deed was afterwards set aside, as to her husband, still it was a good conveyance as to her for she was not insane or unduly influenced.

This is not tenable. The relinquishment of the dower by the wife was the incident and the conveyance of the husband's title was the main purpose of the deed to Gilbert Blake. When a wife joins a husband in a deed to his land and relinquishes her dower, it is implied thereby that a portion of the consideration named in the deed, or actually paid, represented the value of her dower interest. In this case no consideration passed to anyone for the conveyance to Gilbert Blake. It was wholly a voluntary conveyance, and has been set aside and vacated as to the husband, as herein stated. When it was set aside as to the husband, it was thereby also annulled as to the wife. In Bohannon v. Combs, 97 Mo. l. c. 448, SHER-WOOD, J., speaking for this court said: "Although there are authorities to the contrary, the better opinion is that when a conveyance of the husband in which the wife joins is set aside as being fraudulent as to creditors,, (and the same is true if fraudulent as to his heirs) "this will result in reviving the wife's right of dower; for that the deed of the husband being void, there is no estate left in the grantee upon which the relinquishment of dower can operate; hence the wife is restored to her former rights. [Robinson v. Bates, 3 Met. 40; Malloney v. Horon, 49 N. Y. 111; Dugan v. Massey, 6 Bush. 81; Blanton v. Taylor, Gilmer, 209; Belford v. Crane, 16 N. J. Eq. 265; Wyman v. Fox, 59 Me. 100; Stinson v. Sumner, 9 Mass. 143; Humes v. Scruggs, 64 Ala. 40; Richardson v. Wyman, 62 Me. 280; Hinchcliff v. Shea, 103 N. Y. 153;

Summers v. Babb, 13 Ill. 483; Woodworth v. Paige, 5 Ohio St. 70.] The doctrine announced and supported by the foregoing authorities has received the approval of an eminent author. 1. Wash. Real Prop. (5 Ed.), 261."

In Wells v. Estes, decided January 22, 1900, and not yet reported, Burgess, J., followed and reaffirmed Bohannon v. Combs, *supra*, and held that when the husband's deed is set aside for fraud, the wife's right to dower is revived notwithstanding she joined in the deed and relinquished her dower, for when the deed is set aside as to one it is set aside as to both, except when the wife has also been guilty of a fraud as is pointed out was the case in Stevenson v. Edwards, 98 Mo. 622, and Thompson v. Cohen, 127 Mo. 215.

It is contended, however, that the decree setting aside the deed to Gilbert Blake, also expressly vested the title to the property in Gertrude Bealey, J. J. Blake and Lucy E. Snyder, and hence Mrs. Blake's rights of homestead and dower were cut out.

Mrs. Blake was not a party to that suit and hence is not concluded by that judgment. The children of Norton Blake and William Bealey, his son-in-law, were the only parties to that suit. The decree divested the legal title out of William Bealey by cancelling the deeds under which he acquired title. When this was done it left the title in Norton Blake the same as if he had never parted with it. This placed the title in him at the time of his death, and the statutes of descent, homestead and dower did the rest. The portion of that decree which undertook to vest the title in Gertrude Bealey, J. J. Blake and Lucy E. Snyder, gave them no greater rights than they would have had without any such attempt. The only right they ever had or have now, is by virtue of the statute of descents, which is a subordinate right to the homestead and dower rights of the widow, for Norton Blake could have cut off their right under the statute of descents by making a will or selling the property before his death (if he had capacity to

contract), but he could not cut off his widow's right to dower, without her consent.

For these reasons, the circuit court erred in refusing to give Mrs. Blake's fourth instruction declaring that she was entitled to dower notwithstanding the deed of April 16, 1890, to Gilbert Blake.

## III.

The only remaining question necessary to be determined now is whether Mrs. Blake is entitled to a homestead in the land in suit.

It is beyond question that Blake and his wife lived on the land from 1866 to March or April, 1890, and that they left it only because his life was in danger from his tenants the Pattons. Then they went to stay with her daughter Mrs. Young. Mrs. Blake has remained there ever since, but Mr. Blake's health being impaired by age and the troubles he had with the Pattons, he visited his son in Kansas, and some friends in Oklahoma, but returned to Missouri for the purpose of voting at the general election in November, 1890. He always expressed an intention to return to the old place, until the 23d of February, 1891, when he wrote from the home of his son in Louisiana, where he was visiting, to his son-in-law in Kansas, saying he would never spend another day "among the Christian thieves and religious robbers of Missouri." This is the one item of evidence upon which the children rely to defeat Mrs. Blake's claim to a homestead right, because of an abandonment of the property as a homestead by the husband. Laying aside the bad taste expressed in this letter, the language employed shows that the circuit court properly held that Blake was "in such a demented, deranged, weak-minded and insane condition......as not to understand or appreciate the nature and character of the transaction in which he was engaged," as it did with respect to the deeds of April 16th and October 4th, 1890. If he was so insane as to avoid his deeds

in 1890, he was likewise too insane to form a purpose to abandon his homestead or to understand or appreciate the nature or character of the act of changing his domicile or his residence. It is only when viewed in the light of such an impaired mental condition, that his paradoxical talk about "Christian thieves and religious robbers in Missouri" can be accounted for. For it must be remembered that his troubles with the Pattons were settled in July, 1890. He returned to Missouri to vote in November, 1890. He went to visit his relatives and friends and to try to regain his health some time after the election. Up to that time he had always claimed Missouri as his residence and this place as his home. No explanation is given for the ravings in his letter of 23d of February. No testimony is offered, other than this letter, that he changed his mind after he left Missouri the last time and determined to abandon his homestead. He died about a month after this letter was written, after being sick quite a while. It is only charitable to the memory of this old man, who had lived a blameless life on this place, with never a disagreement with his wife, to believe that the seeds of disease and decay which had so sapped his mind that he could not make a valid deed in April or October, 1890, had grown into the fullness of childishness and imbecility when he wrote the letter referred to.

Upon the whole case it seems clear that he had not abandoned his homestead, but left it from fear of bodily harm, and was staying away from it only temporarily while seeking by travel and change of scene to recover his health, and that therefore his widow is entitled to enjoy the homestead until her death or remarriage. Moreover, no defense of abandonment of the homestead by the husband is pleaded in this case, and this question was not legitimately before the trial court for its determination.

For these reasons the judgment of the circuit court is reversed and the cause remanded to be proceeded with in accordance herewith. It is so ordered. All concur.