OSCAR KEELINE v. FRED SEALY and MARY F. SHAWHAN, Appellants.

**Division One, April 13, 1914.**

1. **HOMESTEAD: Residence: Deed Recorded.** The recording of the deed to property and residence there by a woman and her son thereafter, constitute the property her homestead.

2. **————: Continuity: Conveyance.** The conveyance of a homestead to another, followed by a reconveyance, with no independent consideration for either deed, does not break the continuity of the homestead right.

3. **————: Abandonment.** Homestead statutes should be liberally construed, and there is no feature in which the propriety of such construction is more evident than in questions relating to abandonment. Nor is it sufficient that homes already acquired and paid for be protected from sale; it is as important that the people be protected in acquiring and paying for them. Sometimes it is necessary to seek employment elsewhere for that purpose, and when this is done in good faith to give effect to the reason of the statute, there is no more reason why the homestead should be forfeited than that the homestead inchoate after the filing of the deed should be forfeited by delay in constructing a dwelling.

4. **————: ————: Judgment Lien: Ejectment: Instructions.** Where a judgment was recovered September 29, 1906, against M. J., who owned certain property which she claims was her homestead and which she continued to hold until

Keeline v. Sealy.

January 16, 1907, when she conveyed it to her father, and the judgment creditor had the sheriff sell the property and now brings ejectment, an instruction for plaintiff was erroneous which told the jury that under the law and the undisputed evidence the judgment became a lien on the real estate of M. J. from the date of its rendition, "unless you find that said real estate was her homestead as stated in these instructions and continued so to be for three years from that date and that any sale or transfer of any real estate by M. J. during said three years did not affect said lien, . . . and that unless you find that said real estate was her homestead as stated in these instructions, such real estate was subject to levy and sale under execution to satisfy said judgment at any time within said three years regardless of such. transfers." Such instruction told the jury that to take precedence of the lien of the ·judgment the homestead must·continue during the entire three years of its life, and that its sale would subject it to the judgment lien.

5. ————: ————: **Presumptions: Burden of Proof: Instructions.** Once a piece of property has become a homestead, that status is presumed to continue until the contrary appears, and the burden of showing abandonment rests upon him who would subject the property to a judgment lien. Therefore, where a woman moved away from property in which she had established a homestead, in order to devote her attention to a hotel in which she had an interest and which was running down from lack of attention,·and she never returned to the property but afterward conveyed it to her father, having in the meantime kept several rooming houses but having acquired no other home, it was error in this action in ejectment to instruct the jury that her removal from the property constituted a prima-facie case of abandonment of the homestead, raised a presumption against her claim, and put the burden on her of showing an intention to return, and that the removal was only temporary in its nature and with the incident intention of reoccupancy.

6. ————: ————: **Intent: Instructions: "Facts and Circumstances in the Case."** In this action in ejectment the plaintiff claims through a sheriff's deed made pursuant to a sale under a judgment obtained against the defendant September 29, 1906. Defendant claims a homestead, and it appears that she had lived in the property, but that in 1905 she had left it in order to devote her attention to a hotel in which she owned an interest and which was running down from lack of attention, and that she did not return to the homestead property, but sold it January 16, 1907, having in the meantime kept several rooming houses but having acquired no other home. Although as the case shaped itself it has no bearing on the

real issues, testimony was introduced to show that a part of the purchase price of the property in question was obtained by a sale of the woman's prior homestead; and she was cross-examined with the evident intent of showing that her rooming houses were really bawdyhouses, but there is no showing that such was the case, at least prior to the date when she sold the homestead property. *Held*, that it was error to instruct the jury that in finding whether there was an abandonment of *both* the homestead properties they should find the question of her intent or non-intent to return to *"these places* and make them her home, *from all the facts and circumstances in the case,"* and that, in determining whether she had a fixed intention of returning to the property they might take into consideration "the business or businesses and occupation engaged in by her after leaving the premises in question, as well as the facts and circumstances in the case."

7. ————: ————: Intructions: Credibility of Witnesses. Where, in this action in ejectment for property in which defendant claims a homestead, it is attempted, somewhat by innuendo, to show abandonment, and there is nothing in the evidence indicating a wilful effort to misrepresent or suppress any material fact, it was error to instruct that in determining the weight and credibility of a witness's testimony the jury will take into consideration "his or her interest, if any, in the result of the trial, his or her relation to or feeling toward the parties, the probability of his or her statements, as well as all the facts and circumstances in evidence," and "if you believe that any witness has knowingly and wilfully sworn falsely to any material fact, you are at liberty to reject all or any portion of such witness's testimony." [GRAVES, J., dissenting as to comment made in this point.]

Appeal from Jackson Circuit Court.—*Hon. R. B. Middlebrook,* Judge.

REVERSED AND REMANDED.

*Wilson & Wilson* and *George W. Day* for appellants.

(1) There is no such thing as a lien of a judgment upon the homestead of the judgment debtor; therefore the homesteader may convey the same unaffected by the judgment and such sale will not be fraudulent. Grimes v. Portman, 99 Mo. 229; Bank v. Guthrey, 127

Mo. 195; Macke v. Byrd, 131 Mo. 382; Rose v. Smith, 167 Mo. 81; Reed v. Nicholson, 189 Mo. 396; Seilert v. Mc-Anally, 223 Mo. 505. (2) A married woman may invoke the homestead laws for the protection of real property owned by the head of a family, except in cases where the husband has claimed such homestead right for the protection of his own property. R. S. 1909, sec. 8304; R. S. 1899, sec. 4335; Sharp v. Stewart, 185 Mo. 518. (3) The sale of one homestead and the purchase of another with the proceeds of the former gives the homesteader the same rights in the new as in the old homestead. R. S. 1909, sec. 6712; R. S. 1899, sec. 3623; Rose v. Smith, 167 Mo. 81; Goode v. Lewis, 118 Mo. 357; Smith v. Enos, 91 Mo. 579; Creath v. Dale, 84 Mo. 333; Farra v. Quigley, 57 Mo. 284. (4) No title could pass by the sheriff's deed, if any portion of the proceeds of the former homestead was invested in this one, because, to the extent they were invested, to that extent the new homestead was protected. Rose v. Smith, 167. Mo. 87. (5) Where one homestead is exchanged for another, the record of the deed for the latter is not essential to the acquisition of a homestead right therein. Smith v. Enos, 91 Mo. 579; Creath v. Dale, 84 Mo. 349; Farra v. Quigley, 57 Mo. 284. (6) Mrs. Johnston was allowed a reasonable time after concluding to give up her homestead to her father to effectuate that purpose through the execution and delivery of a proper deed of conveyance, and this right should not have been denied her by the court's instruction. Goode v. Lewis, 118 Mo. 36; Klotz v. Rhodes, 240 Mo. 504. (7) The declarations of Mrs. Johnston respecting her intentions regarding her alleged homestead; her absence therefrom and her return thereto were proper evidence to show that she had not abandoned the same. Drug Co. v. Bybee, 179 Mo. 354; Mills v. Mills, 141 Mo. 198. (8) Regardless of whether or not a portion of the proceeds of sale of a former homestead went into this property, if the property in question was Mrs. Johnston's homestead at the

time it was seized in execution, the admission that the return on the execution shows the sheriff took no steps to set aside a homestead, renders his deed void.    Kessner v. Phillips, 189 Mo. 529.    (9)    The statement of Mr. Michaels that Mrs. Johnston told him while she was at the East End Hotel that the property at 2536 Agnes Avenue was heavily incumbered but she was going to try to sell it, does not show an abandonment of it as a homestead 21 Cyc. 605.    (10)    Instructions presenting abstract propositions of law to the jury are liable to mislead it, and should be avoided.    Fischer v. Lead Co., 156 Mo. 495; Hoepper v. Southern Hotel, 142 Mo. 375; Bradley v. Railroad, 138 Mo. 293; Campbell v. Transit Co., 121 Mo. App. 406; Hewett v. Price, 99 Mo. App. 666.    (11)    An instruction that the jury may reject all or any portion of the testimony of a witness who they believe has knowingly and wilfully sworn falsely, should never be given unless the trial judge strongly suspects that wilful false swearing has been done in the case. Schmidt v. Railroad, 149 Mo. 289.    (12)    It is of the essence of an abandonment which will deprive a person of his homestead right that the leaving of it by such person was with the intention of giving up the place as a home.    Spratt v. Early, 169 Mo. 368; Bealey v. Blake, 153 Mo. 674; Mills v. Mills, 141 Mo. 198; Leake v. King, 85 Mo. 416; Snodgrass v. Koppel, 131 Mo. App. 351; Lawson v. Hammond, 119 Mo. App. 596; Victor v. Grimmer, 118 Mo. App. 596; Holmes v. Nichols, 93 Mo. App. 515.

*Haff, Meservey, German & Michaels* for respondent.

(1)    If a homesteader removes from the homestead, such removal raises a *prima-facie* presumption of abandonment, casting on the homestead claimant the burden of showing an intention to return; and such intention must be constant and fixed. Kaes v. Gross, 92

Mo. 655; Smith v. Bunn, 75 Mo. 559; Gunn v. Wynne, 43 S. W. 290; Schwartzman v. Cabell, 49 S. W. 113; Vittengl v. Vittengl, 135 N. W. 63; 21 Cyc. 621; 22 Cyc. 1456. (2) A mere intention to return to a homestead can have no influence whatever in restoring the right of homestead exemption once it is lost by actual abandonment, unless such intention is evidenced or executed by actual occupancy. Kaes v. Gross, 92 Mo. 647; Smith v. Bunn, 75 Mo. 559; Smith v. Thompson, 169 Mo. 563. (3) The giving of instructions containing abstract propositions of law, while not the best practice, does not warrant reversals. McGrew v. Railroad, 109 Mo. 582; Burdoin v. Trenton, 116 Mo. 358; Benjamin v. Railroad, 133 Mo. 274; Hemphill v. Kansas City, 100 Mo. App. 563. (4) Instructions should be read as a whole and when they thus fairly present the law, a judgment will not be reversed on account of the incompleteness of some particular one. Harrington v. Sedalia, 98 Mo. 583; Whalen v. Railroad, 60 Mo. 323; Minter v. Bradstreet, 174 Mo. 446. (5) The questions of homestead or not and abandonment or not, are essentially questions of fact and are to be determined from all the facts and circumstances in the case, and it is proper for the jury to consider the movements of the claimant, as well as the business or businesses engaged in, in determining the question of abandonment. Mathewson v. Kilburn, 183 Mo. 113, 20 Cyc. 620; Kaes v. Gross, 92 Mo. 647; Duffey v. Willis, 99 Mo. 132; Mattingly v. Berry, 94 Ky. 544; Banking Co. v. Brown, 165 Mo. 37. (6) The use of the terms "burden of proof" and "prima facie" in instructions does not necessarily have to be explained, and their unexplained use never results in reversals. Owens v. Pierce, 5 Mo. App. 575; Miller v. Boot & Shoe Co., 26 Mo. App. 57; Steinwende v. Creath, 44 Mo. App. 360; Warder v. Henry, 117 Mo. 530; Crapson v. Wallace Bros., 81 Mo. App. 680, 685. (7) The giving or refusal of an instruction respecting the credibility of witnesses is in the discre-

tion of the court and in this case the giving of such instruction was more than justified. White v. Maxey, 64 Mo. 559; McCormick v. Monroe City, 64 Mo. App. 197; Millar v. Car Co., 130 Mo. 517; Hartpense v. Rogers, 143 Mo. 634. (8) The character of witnesses can be taken into consideration by the jury in determining the credibility and weight to be given the testimony of such witnesses. Harrison v. Lickman, 189 Mo. 601. (9) It is not error for a court to modify an instruction so that it will harmonize with other proper instructions. Feary v. Railroad, 162 Mo. 75.

BROWN, C.—Ejectment for a house and forty-foot lot in Kansas City designated in the briefs of counsel as 2536 Agnes avenue, and for short the "Agnes" property. The common source of title is Margaret L. Johnston. Plaintiff claims through a sheriff's deed to himself, dated June 7, 1909, in pursuance of a sale under execution issued March 23, 1909, upon a judgment of the Jackson Circuit Court recovered by F. H. Evans against the said Margaret L. Johnston September 29, 1906, for $1641.25. This judgment was founded upon a promissory note dated March 2, 1905, for fifteen hundred dollars, with interest at six per cent per annum; principal and interest payable in installments of fifty dollars per month beginning May 1, 1905. Another sheriff's deed was introduced by plaintiff on the trial, dated March, 1906, founded upon a judgment by a justice of the peace, rendered December 19, 1905, for $218.75, upon a promissory note from Mrs. Johnston to F. H. Evans of the same date for $215. Also a quitclaim deed from Evans to plaintiff, date not in the record, but recorded July 23, 1906. This last sheriff's deed is the same in question in case No. 15613 of the same title as this, determined at this term, and will not be noticed further. Plaintiff also introduced a warranty deed dated March 29, 1905, and recorded the same day, from Mrs. Johnston to Mollie J. Page, conveying

the same land, and a deed from Mollie J. Page to Mrs. Johnston dated March 30, 1905, and recorded August 17, 1905, conveying same land, both subject to deed of trust to Powell, trustee, for $1750.

The defense is founded entirely upon the assertion that at the time of the creation of the debt for which the Evans judgment was rendered, and continuously up to January 16, 1907, when she conveyed to George H. Shawhan, her father, the land in question was the homestead of Mrs. Johnston. It was formally admitted upon the trial that it did not exceed in value or quantity the amount allowed by statute to the head of a family as a homestead, and there was no question raised as to the fact that Mrs. Johnston, from about June 20, 1904, up to some time in April, 1905, resided in the six-room house upon the lot, with her son then about ten years old. They continued to live there until some time in April, 1905. At about the time she purchased the house and moved into it she brought suit against her husband, John P. Johnston, for divorce and obtained it in October or November of the same year The plaintiff's contention is that at the time she left the house in the spring of 1905, or at some future time previous to her conveyance to her father, she abandoned it as a homestead so that the lien of the Evans judgment attached and the title passed by the sale under the Evans judgment. The abandonment is denied by the defendants and this constitutes the only issue made in the case.

Mrs. Johnston purchased the property from Mollie J. Page, taking a warranty deed therefor dated June 17, 1904, in which the consideration was expressed to be $3750 and subject to a deed of trust secured by the grantor June 15, 1904, to George A. Welsh, in trust to secure to the City Lot Company the payment of a promissory note of that date for $1750, due five years after date with semi-annual interest coupons for the interest at six per cent; also to another deed of trust of the

same date from the same grantor to Walter A. Powell, in trust to secure the payment to Lillian C. B. Diehl of a collateral promissory note securing notes payable as follows: Twenty-five dollars on or before July 15, 1904; twenty-five dollars on or before August 15, 1904; two hundred fifty dollars on or before September 15, 1904; and one thousand four hundred and fifty dollars in monthly installments of twenty-five dollars each, payable on or before the 15th day of October, 1904, and on or before the 15th day of each succeeding month thereafter until the whole amount is paid with interest on each installment at six per cent per annum, payable at maturity. On November 29, 1905, Mrs. Johnston placed a third deed of trust upon the land to secure the payment to Joseph E. Brown of twenty-one promissory notes each for the sum of fifty-four dollars falling due monthly.

Mrs. Johnston in 1889 married one Lackey, from whom she secured a divorce after having lived with him about four years. Her only children were born of this marriage; the elder, a daughter who has lived with her grandparents a greater part of the time since her birth, and was educated by them, and the son, Edgar, born soon after the divorce. She afterwards married one Spencer, who lived with her in her house at Lone Jack, in Jackson county, about a year and then went to Independence, and finally to Kansas City, where she was divorced from him in 1899. Her mother, Mrs. Shawhan, had started a rooming and boarding house at 710 East Fourteenth street, and when her parents left Kansas City and went to Weston to live in 1900, Mrs. Johnston took it, lived there with her son, and ran it until about two weeks before she purchased the Agnes property, when she sold the furniture which had been left in the house by her mother, and vacated it.

After the divorce, Johnston brought Evans, said to be the owner of the East End Hotel, out to the Agnes avenue house, accompanied by J. C. Bliss, a cattle killer

at one of the packing houses, to see about the purchase of that hostelry. They all told her it was a good place and she could make some money there and she bought it, giving Evans the note upon which this judgment was rendered, and the note for $215 upon which the justice's judgment we have already referred to was founded. Of this "purchase" Mr. Bliss says in his testimony: "I was connected with the purchase of the East End Hotel in March, 1905, taking a partnership there. I purchased with Mrs. Johnston. I knew her husband, John P. Johnston. At the time of that purchase it was understood that Johnston was to be the manager of the place and that another man, named Joe, was to be the bar manager. At the time of the purchase Mrs. Johnston was living on Agnes avenue, but I do not remember the number. I went out there to see her about this purchase with Mr. Grear and Mr. Evans and Mr. Johnston, before she bought the place. Mrs. Johnston did not come down to the place immediately after its purchase, but she did come there about six or eight weeks after, as far as I can recollect. The occasion of her going down there was that the place was not running along satisfactorily. There was a disagreement between the parties outside of myself, and she thought she would go down there and try to look after affairs. The disagreement was that the bartender was getting all the change. There was nothing coming in. Between Johnston and him it was the first up the best off.

"I had a monetary interest in that hotel. I paid over my money in the presence of Mr. Evans and Mr. Gear. I supposed Evans owned the property. I do not know that Mrs. Johnston gave these notes for the purchase price of the place. I never gave any notes. What little I paid was in cash. I had roomed there at the hotel for six or eight months. I was not then married, but am now. . . . I did not continue in

that business down there as long as Mrs. Johnston did for the reason that there was nothing coming.''

Mrs. Johnston stated, in substance, that she went into the East End Hotel to make money to pay the indebtedness on the Agnes house. That things went so badly there that she was compelled to go down; she could not manage it by going down there in the daytime and back to the Agnes house at night, and moved down there in April, taking furniture for two bedrooms. She left some of the furniture with Mrs. Stearns, her next door neighbor, and some of it in the Agnes house. She had found in the fall of 1905 that she could not make it go in the hotel and gave it up October 1, 1905, surrendering the house to Mr. Evans at the request of Mr. Winston, his agent, who told her that it would save her a great deal of trouble, ''and Mr. Evans also,'' and storing her stuff. She had no roomers to go back to Agnes with. She tried, and could get none, and about October 10, went to 1305 Summit street, where she kept rooms about two months. She then went to 309 East Twelfth street, between McGee and Oak streets, which she called the Alta Vista. She remained at that place eleven months and twenty days, moving because the police gave an order that all rooming houses between Grand avenue and Oak street should move. She stored her things and went to the Monarch hotel where she remained about a month. She then took the rooming and boarding house at 701 East Twelfth street, into which she moved January 20, 1907. Her father testified that she had never called on him for money that she did not get it. That she had talked with him about going to the East End Hotel to make money to pay out the Agnes property and he had advised her not to try, because the debt was too big. Just before making the deed she told him that she had to give up; she couldn't make it go there, there was too much incumbrance; that she had got all the money from him that she ought to get, and if

he would take the mortgage off her hands she would make him a deed to it. This arrangement was made. Mr. Shawhan paid off the incumbrance on the property and paid or allowed her, on account of advancements he had made, enough to make up the consideration of the deed, $3750.

Having removed to a place east of Oak street she was placed by the police on what the plaintiff's attorneys designate the fine list, and was assessed a regular monthly fine, which she paid for the months of June, July, and August, and possibly September, the month before she moved out. This was a process which the attorneys called being "fined by the police." The evidence that it was done after the conveyance to Mr. Shawhan was offered and admitted as bearing upon the credibility of the witness.

The deeds made between Mrs. Page and Mrs. Johnston, March 29 and 30, 1905, were without consideration except so far as each constituted a consideration for the other. It is not contended in briefs or argument that they interfered with the continuity of the homestead.

The following instructions were given for the plaintiff over the objections of defendants, and exceptions duly saved:

"2. You are instructed that under the law and the undisputed evidence in this case the judgment obtained by F. H. Evans against Margaret Johnston became a lien on the real estate of Margaret Johnston from the date of its rendition, to-wit, September 29, 1906, unless you find that said real estate was her homestead as stated in these instructions and continued so to be for three years from that date and that any sale or transfer of any real estate by Margaret Johnston during said three years did not affect said lien, but that the purchaser or grantee took such real estate subject to such lien, and that unless you find that said real estate was her homestead as stated in these

instructions, such real estate was subject to levy and sale under execution to satisfy said judgment at any time within said three years regardless of such transfers.

"3. You are instructed that under the law and the evidence in this case, if you believe that at one time Mrs. Margaret Johnston, otherwise known as Margaret Lackey, had a homestead in the property in controversy, but that at any time thereafter and before parting with the title thereto she removed therefrom, and at any time prior to January 16, 1907, she ceased to have any intention of returning thereto, then you must find for the plaintiff.

"5. The jury are instructed that the intention to return, by which the homestead rights are preserved, must be formed at the time the removal occurs. A subsequent unexecuted intention to resume possession would not have the effect to restore the right to hold the property as a homestead.

"7. You are instructed that in determining whether or not Mrs. Johnston had a fixed intention of returning to the property after moving away you may take into consideration the business or businesses and occupation engaged in by her after leaving the premises in question as well as all the facts and circumstances in the case.

"8. The removal of Mrs. Johnston, otherwise known as Mrs. Lackey, from the property in controversy, if it was a homestead, constitutes a prima-facie case of abandonment of the homestead and raises a presumption against the claim of homestead; and puts the burden of proof on her of showing an intention to return, which must be rebutted before such claim can successfully be asserted, and it must be shown that the removal was only temporary in its nature, and with the coincident intention of reoccupancy, and if you believe that when Mrs. Johnston removed from the premises in controversy the removal was not temporary in its

nature and that she did not at that time have a fixed intention of reoccupying the premises, she has in law abandoned her homestead and you must find a verdict for the plaintiff.

"9.  You are instructed that a homestead may be abandoned and that whenever a homestead is left with no intention of returning to it, it is considered as abandoned, and if you believe that previous to the time she parted with title thereto Mrs. Johnston had left the property in dispute, having no fixed intention at the time she left it of returning to it, she is considered as having abandoned the premises as a homestead and in such case you must render the verdict in favor of the plaintiff.

"10.  The jury is further instructed that if in this case you believe that Mrs. Johnston, otherwise known as Mrs. Lackey, had at one time a homestead right in the property in controversy, and that prior to the time she parted with the title thereto she left the property with an intention existing at that time to return to it in the future, but after leaving the property and before parting with her title thereto she abandoned her intention of returning to it, then you are instructed that she could not thereafter revive any homestead rights in such property, but that plaintiff's judgment lien attached to said property, freed from any such claim.

"11.  The jury are instructed that they are the sole judges of the credibility of the witnesses and of the weight to be given to their testimony.  In determining such credibility and weight they will take into consideration the character of the witness, his or her manner on the stand, his or her interest, if any, in the result of the trial, his or her relation to or feeling towards the parties, the probability of his or her statements, as well as the facts and circumstances in evidence. In this connection you are further instructed that if you believe that any witness has knowingly and wilfully

sworn falsely to any material fact, you are at liberty to reject all or any portion of such witness's testimony.

"12.   You are instructed that only a housekeeper or head of a family can claim a homestead right and that such right ceases the moment such claimant ceases to be a housekeeper or head of a family.   By housekeeper is meant one who keeps a house to use as a residence for himself or herself, and his or her family, and by head of a family is meant one who controls, supervises or manages the affairs about the house, and by family is meant more than one person, who live in one house under one head."

The defendants asked for the following instruction which the court refused:

"7.   If you believe from the evidence in this case that at the time Margaret L. Johnston conveyed the premises in controversy in this action to Mollie J. Page, to-wit, March 29, 1905, the same constituted the homestead of Mrs. Johnston, as other instructions given you herewith declare to be requisite to the existence of a homestead; that said premises were, in part, paid for with the proceeds of the sale of the Lone Jack property owned by her; and that said Lone Jack property, at the time of the purchase of the premises in question by Mrs. Johnston, was the homestead of Mrs. Johnston, according to the definition of a homestead, given in the other instructions; and that, on the same day and at the same time that Mrs. Johnston delivered the aforesaid deed to Mollie J. Page, said Mollie J. Page executed and delivered to Mrs. Johnston a deed conveying said premises back to Mrs. Johnston, and that the conveyance from Mrs. Johnston to said Mollie J. Page, and from said Mollie J. Page back to Mrs. Johnston, was for the sole purpose of protecting Mrs. Johnston against a claim of the former husband of Mrs. Johnston to or in said premises, then the conveyance thereof from Mrs. Johnston to said Mollie J. Page, and from said Mollie J. Page back to Mrs. Johnston,

had no effect whatever upon the homestead right of Mrs. Johnston in and to said premises, if you find from the evidence, that she, at that time, had such homestead rights.''

Also the following, which were by the court, against defendants' objection and exception, modified by the insertion and addition of the words in italics, and the striking out of the words in parenthesis:

''3. You are instructed that if you believe from the evidence in this case that in the summer or fall of 1904, Margaret L. Johnston had a husband and two children; that she, at that time, occupied the premises in controversy in this action, as her home; that at the time of such occupancy and during all of the time during her marriage with her then husband, Johnston, he, the said Johnston, did not own or claim a homestead for the protection of his own property, then said premises, *at that time,* became, and were, the homestead of said Margaret L. Johnston, within the meaning of the law, *so far as she and not her husband's being entitled to claim a homestead is* concerned.

''4. If you believe from all the evidence in this case that when Mrs. Johnston left the premises in controversy and went to the East End Hotel she had the intention to return to said premises which she left, and that she, at all times thereafter until she sold said premises to her father, had the intention to return thereto and make the same her home, then she did not abandon the same in the sense of the law. *In finding whether there was an abandonment by Mrs. Johnston of the Lone Jack and Kansas City properties you will find the question of her intent or non-intent to return to these places and make them her home from all the facts and circumstances in the case.*

''6. If you believe from the evidence that the house and lot in controversy were the homestead of Mrs. Johnston on the 16th day of January, 1907, and

257 Mo. 33

that the same had been her homestead, as the existence of a homestead is defined and declared necessary in other instructions given you herewith, then she had a perfect right to sell and convey the same to her father, the defendant Shawhan, or to anyone else, and the sheriff's deed thereto, under which the plaintiff claims, (is void) *would not affect the conveyance in any way.*"

I.    The clearing away of some of the debris accumulated during the trial and argument will materially simplify the consideration of the
**Homestead:**
**Requisites.**
real issues.    The record is swollen with evidence relating to the little property at Lone Jack formerly owned by Mrs. Johnston, the common source of title in this case, and in which she formerly resided.    The two things necessary to complete the homestead right invoked in this case were the record of her deed to the land in controversy and its occupation as a homestead, and that these conditions concurred on July 27, 1904, when the deed under which she held the premises was recorded, seems unquestioned; while the cause of action which resulted in the judgment through which the plaintiff claims, accrued March 2, 1905.    The plaintiff states the real issue as follows:    "We most respectfully submit that nowhere in the books can be found a case where abandonment was so clearly shown."    We will assume, then, in line with this statement, that the residence of Mrs. Johnston in the house with her little boy, both during the pendency of her proceeding for divorce, and after its culmination in a decree in her favor, would consummate the homestead, so that it would relate to the recording of her deed.    [Finnegan v. Prindeville, 83 Mo. 517; Sharp v. Stewart, 185 Mo. 518; Sperry v. Cook, 247 Mo. 132.]

II.  The matter connected with the conveyance of the premises by Mrs. Johnston to Miss Page, and the reconveyance by the latter to the for-

**Continuity.** mer in March, 1905, should also be eliminated. That there was no independent consideration for these deeds or either of them is evidently assumed by all parties.  The only consideration of the deed from Miss Page to Mrs. Johnston was the deed from Mrs. Johnston to Miss Page; and there is no more reason why it should disturb the continuity of the homestead than if the exchange had been for a new one, or the consideration paid in cash and reinvested in a new one.  In such cases no doubt exists that the rights possessed in the original homestead transferred by the exchanges to the last one acquired.  [Smith v. Enos, 91 Mo. 579; Creath v. Dale, 84 Mo. 349; Goode v. Lewis, 118 Mo. 357.] There is no reason why a mere exchange in the deeds under which the original homestead is held should have any other or greater effect.

III.  This court, referring to the homestead laws, said in Sharp v. Stewart, supra, and has since had oc-

**Abandonment of Homestead.** casion to repeat, that "in view of the benevolent purposes sought to be accomplished by them it has been nearly the universal ruling of the courts, that such statutes should be liberally construed;" and there is no feature in which the propriety of such construction is more evident than in the questions relating to abandonment. The innovation upon the common law which authorizes the sale of lands in execution struck directly at the homes of the poor and financially unfortunate, and it early became a question how far these were to be shielded from its effect.  It has not been a question of charity or favor, but of enlightened public policy, directed to the development and preservation of a strong and self-respecting citizenship.  [Balance v. Gordon,

247 Mo. 119, 124 and cases cited.]    In the intelligent pursuit of this policy it is not sufficient that homes already acquired and paid for be protected from sale.    It is at least as important that the people be protected in acquiring and paying for them, and that their efforts in this direction should not be paralyzed by hanging the homestead like a millstone about their necks to embarrass their movements in acquiring the means to that end.    Sometimes it is necessary to seek employment elsewhere for that purpose, and when this is done in good faith to give effect to the reason of the statute, there is no more reason why it should be forfeited than that the homestead inchoate after the filing of the deed should be forfeited by delay in constructing a dwelling.    [See Sperry v. Cook, 247 Mo. 132.]

IV.    In proceeding to the examination of the instructions, it is well to call attention to the admission of the plaintiff "that a homesteader may convey, unaffected by the lien of a judgment," and "that if the property in question in the case was Mrs. Johnston's homestead and was not abandoned by her, then the admission that the return on the execution, showing that the sheriff took no steps to set aside a homestead, rendered the deed void;" as well as his statement that "practically the sole question in the case is whether after acquiring 2536 Agnes avenue, and within three years after the date of the pendency of the Evans judgment, Mrs. Johnston abandoned the property in controversy, and, incidentally, whether or not she ceased to be a housekeeper or head of a family within the meaning of the homestead acts."    He properly assumes that the land became her homestead, and admits that the sole question is whether that relation ceased in time to give validity to his sheriff's deed.

**Admissions.**

V. The second instruction for plaintiff, as given by the court, is not only erroneous but peculiarly calculated to mislead the jury. To understand this we must consider that the Evans judgment under which the sheriff's deed relied on by plaintiff was made, was rendered September · 29, 1906, only about three and a half months before the conveyance by Mrs. Johnston to her father on January 16, 1907, and that its lien, in the absence of the homestead would extend to September 28, 1909. The plaintiff insisted on following in the evidence Mrs. Johnston's business and movements up to the end of 1907, and, although the court admitted the testimony on the ground that it might develop something affecting her credibility as a witness, the plaintiff's attorney did not cease to protest that he was introducing it because it related to "her intention not to go back and build a home there for herself and her children."

*Instructions: Judgment Lien.*

Under these circumstances it would have been natural and right to have instructed the jury in substance that if the premises were on September 29, 1906, and continued to be until January 16, 1907, the homestead of Mrs. Johnston, then the sheriff's deed founded on the judgment rendered on the first named date was void. Instead of doing so the plaintiff and court together framed and gave an instruction which we reproduce in full in this connection, all that part in italics having been inserted by the court. It is as follows:

"2. You are instructed that under the law and the undisputed evidence in this case the judgment obtained by F. H. Evans against Margaret Johnston became a lien on the real estate of Margaret Johnston from the date of its rendition, *to-wit, September 29, 1906, unless you find that said real estate was her homestead as stated in these instructions* and continued so to be for three years from that date and that any sale

or transfer of any real estate by Margaret Johnston during said three years did not affect said lien, but that the purchaser or grantee took such real estate subject to such lien, and that *unless you find that said real estate was her homestead as stated in these instructions,* such real estate was subject to levy and sale under execution to satisfy said judgment at any time within said three years regardless of such transfers.''

Reducing the first proposition of this somewhat complicated sentence to its simplest terms by elimination of its subordinate parts, and leaving the order of expression unchanged, we have: ''The judgment became a lien on the real estate of Margaret Johnston from the date of its rendition unless said real estate was her homestead and continued so to be for three years from that date.'' It is useless now to speculate as to what might have been done with this instruction to make it express a different meaning from that which it does express in its present form. Even by the segregation by punctuation of the words, ''unless said real estate was her homestead as stated in these instructions,'' a hint might have been conveyed that they were intended to be eliminated from the grammatical construction of the principal parts of the proposition, and read as an independent clause; but, although carefully and expressively punctuated in other respects, there is no sign of a comma here. Even that poor substitute for the unambiguous words in which a jury should be directed is lacking, so that, we venture to say, no English scholar would read in the sentence a meaning ulterior to its primary one that to take precedence of the lien of the judgment the homestead must continue during the entire three years of its life, and if it were abandoned during that time the lien would come in. This is strengthened by the subsequent statement in the same instruction, that a purchaser or grantee of Mrs. Johnston during that time would take subject to the lien, and by the further statement that

unless the real estate was her homestead as stated in the instructions (that is to say, during the entire three years) it was subject to levy and sale at any time within the three years. In other words, the sale of the homestead subjects it to the judgment lien. It does not help the situation to say that this particular phraseology resulted from a careless combination of the labors of the court and the plaintiff, and that their intentions were good; the interests of the litigants were the matters involved, and they had, and have, the right to the presentation of the questions so that they may be plainly understood by jurors equipped with a good knowledge of English and without special legal training.

VI. The court instructed that the removal of Mrs. Johnston from the property in controversy "constitutes a prima-facie case of abandonment of the homestead and raises a presumption against the claim of homestead, and puts the burden of proof on her of showing an intention to return, which must be rebutted before such claim can successfully be asserted, and it must be shown that the removal was only temporary in its nature and with the incident intention of re-occupancy."

**Presumptions: Burden of Proof.**

If this be true as a general legal proposition it makes the ownership of a homestead a very delicate matter. It must not only be nursed to healthy maturity, but must be preserved in its old age from those little attacks of enforced or necessary absence which are so often incidents of the pursuit of daily bread, or of a house of one's own for the comfort and security of one's declining years. Should the house be destroyed by an earthquake, although he would be excused, no doubt, for leaving the premises, it would place him under the burden of proving affirmatively that he intended to go back; but if, under stress of such a catas-

trophe he should, in leaving, express the opinion of the moment about going back to such a place, this court would probably have to interfere to abate the consequences, as it did in the case of Mr. Blake in Bealey v. Blake, 153 Mo. 657. If one's home is to be a prison which he can only leave for any of those purposes of work, business, pleasure or health which enter so largely into the normal daily life of our time, without assuming the burden of convincing a jury as to the state of his mind when he did it, the statute which purports to secure his home from loss through financial disaster is far from being an unmixed blessing.

In Seilert v. McAnally, 223 Mo. 505, the circumstances relating to the abandonment of the homestead were practically the same as in this case. McAnally and wife lived on a homestead in Stoddard county. They left it and went to Dunklin county to live, and while in the latter county he received a letter from Houck, a lawyer, telling him that he had abandoned his homestead and that he, Houck, intended to enforce the collection of a machine note he had in his hands for that purpose. McAnally, to avoid payment of the note, transferred the Stoddard county homestead to his wife. In determining whether the homestead had been abandoned at the time of this transfer, the court, through LAMM, J., said:

"Under this record the land in controversy was once the homestead of William F. and Martha Isabell. That status is presumed to continue until the contrary appears. The burden, then, was on the plaintiff to show it ceased to exist, and until he successfully carried that burden the McAnally title could not be fraudulently dealt with by them. Such has been the law in this State since Vogler v. Montgomery, 54 Mo. 577. The homestead is forbidden fruit to the creditor. He may not take it or eat thereof. Wherefore, as to the world at large, the homesteader (absent a statutory

prohibition) may convey his homestead at his own sweet will, fraud or no fraud."

In Bealey v. Blake, supra, this court held that abandonment of the homestead must be pleaded as well as proved.

The circumstances under which Mrs. Johnston left the Agnes property are all in evidence. When she got it there were incumbrances on it amounting to $3500, which she succeeded in reducing one half before giving up in January, 1907. She acquired no other home during that time. She tried to run the hotel without leaving her home, and when she found it going wrong went to look after it personally. In all the circumstances we see no evidence of an intention on her part in going down to the East End Hotel other than to get money to hang on to the home. We think the eighth instruction for plaintiff, in the particulars to which we have referred, was erroneous and prejudicial.

VII.   At the trial there was some uneasiness on the part of the defendants' attorneys growing out of the deeds to the property in controversy **Erroneous Instructions.** which passed between Miss Page and Mrs. Johnston in March, 1905, to which we have already referred in the second paragraph above. They seemed to fear that it might break the continuity of the homestead right in some way, and having in mind, no doubt, the consistent line of adjudications of this court that the record of the deed under which the original homestead is acquired fixes the time of the beginning of the right of exemption to which all other homesteads afterwards acquired by the proceeds of its sale or its exchange relate, they introduced evidence tending to show that a part of the purchase price of the Agnes property was obtained by the sale of a house and lot in Lone Jack, Jackson county, Missouri, in which she and a former husband

had once resided. The case, as we have seen, assumed such a character that the question of the existence of the Lone Jack homestead was unimportant, and the defendants had the right to a clear charge to the jury as to their real claim that the Agnes property was exempt from sale under execution founded upon the particular judgment involved. It was the only question in the case, and as such should have been, if so requested, clearly submitted to the jury.    For this purpose the defendants asked the court to instruct as follows:

"If you believe from all the evidence in this case that when Mrs. Johnston left the premises in controversy and went to the East End Hotel she had the intention to return to said premises which she left, and that she, at all times thereafter until she sold said premises to her father, had the intention to return thereto and make the same her home, then she did not abandon the same in the sense of the law."

This was a fair statement of the law which must control the jury. It told them, as it should have done, that their finding must be founded upon "all the evidence in this case."

The statute requires that when an instruction is so asked in writing it "shall be given or refused." [R. S. 1909, sec. 1987.]    Instead, the court modified it by tying on the Lone Jack property with a copulative conjunction, and clearly expressing its dissatisfaction with the theory that the jury were to form their conclusion from a consideration of all the evidence.    This contribution of the court was as follows: "In finding whether there was an abandonment by Mrs. Johnston of the Lone Jack *and* Kansas City properties you will find the question of her intent or non-intent to return to *these places* and make them her home, *from all the facts and circumstances in the* case."    There was nothing said about evidence here, and, as we shall see presently, the refusal of this

instruction as asked, and as the defendants were clearly entitled to have it given, and giving it obscured by this modification, comports with a disposition to suggest something to the jury as a vehicle of enlightenment that is not properly described by the word evidence. It appears still more plainly when, upon permitting Mrs. Johnston to testify to her intention to return to the Agnes property and make it her home, testimony to which the defendants were clearly entitled, the court orally commented that he admitted it, "not as settling the question of intention, but to be taken in connection with all facts and circumstances in the case, for whatever weight in that connection it may be given by the jury."

The suggestion to which we have referred finds perhaps its plainest expression in the seventh instruction given for the plaintiff in which the jury are told: "In determining whether or not Mrs. Johnston had a fixed intention of returning to the property after moving away you may take into consideration the business or businesses and occupation engaged in by her after leaving the premises in question, as well as the facts and circumstances in the case." He explains in his brief his theory, and the theory he was attempting to impress upon the jury in this instruction, as follows: "A woman who engages in the business of running a bawdy house or assignation house under the polite name of 'hotel' or 'rooming house' cannot be held to have retained a fixed intention of returning to that most holy of shrines, a home." Clothing the same thought in less picturesque but more judicial language, a woman who has once lapsed from the virtuous preeminence which it is the glory of her sex to have maintained, forfeits the protection of the laws of the land, and is denied even the privilege of her male accomplices to acquire and protect a home for herself and her children. Before adverting further to the application by the court in these instructions

of the principle stated by counsel with such frankness, it is only fair to refer briefly to the evidence upon which it is founded.

Mrs. Johnston had been consecutively the wife of two bartenders; one of them, Mr. Spencer, who was a farmer when she married him, brought her from Lone Jack to Independence and Kansas City, where he was employed in saloons. Her two children had been born of a previous marriage. In the year 1900 she began to try to earn her own living and that of the children by keeping roomers and boarders in a house her mother had been managing in Kansas City. Her parents were evidently good people. They raised and educated her daughter and have stood by her both with respect to money and affection. She purchased the property in question in the summer of 1904, at about the time she instituted proceedings for divorce against Mr. Johnston, her third husband, and became very heavily indebted for it. This indebtedness was so burdensome that she found great difficulty in carrying it and desired some way of earning more money to help her out, and in the beginning of March of the next year, 1905, Mr. Evans came to her with Johnston, who was then a bartender in his hotel, the East End, and two other men, named respectively Bliss and Grear, who were living in that house; and their interview resulted in her assuming for Evans the management of that hotel, retaining Johnston, her former husband, in her service, and the two other men gave her the benefit of their patronage as guests at the hotel. The net results of the meeting were that Mrs. Johnston made to Evans the two notes, aggregating $1750, which are the foundation of this proceeding against the Agnes property. Mr. Bliss says that he became her partner by the payment of "a little money," although he made no note, and as there was no profit in the transaction he had never had any settlement with her. It does not appear whether he

paid his board or received it on account of his proprietary position. It does appear, however, that it was at least suspected that the bar was not returning to Mrs. Johnston the proceeds of its sales, and on account of that and other difficulties she was compelled in a month or two to leave her home and go down there to look after it herself. At some time during October, 1905, she found herself unable to carry the hotel any longer, and Mr. Winston, the agent of Mr. Evans, came to her and advised her to surrender the house and withdraw, which she did. It does not appear that there was any writing connected with the Evans transaction excepting the two notes of Mrs. Johnston to Mr. Evans, one for $1500 and one for $250, already mentioned.

Mrs. Johnston states, and it is not questioned, that upon surrendering the Evans place she attempted to get boarders and roomers to go with her to Agnes avenue, so that she could live and make her payments on that house; that among others she tried Mr. Bliss and Mr. Gear. Failing in this she looked for another place to keep roomers, trying it for a couple of months on Summit street, and finally took a rooming house at 309 East Twelfth street, which she named the Alta Vista Hotel. We fail to find any suggestion in this record that up to that time Mrs. Johnston had been anything other than a hard-working woman who had been trying since June, 1904, to earn money to pay for a home at 2536 Agnes avenue, and there is nothing to indicate that she had not conducted the campaign in a manner consistent with honest womanhood. She opened the Alta Vista in the late winter of 1906, and in the fall of that year a representative of the city in the person of a sergeant of the police called upon her and told her that the department had ordered that all rooming houses on that street between Grand avenue and Oak street must move on to some other part of the city. She acquiesced in this and moved

out of the house, and some time in January, and after she had sold and conveyed the Agnes property to her father, she found a place suitable for a rooming house at 710 East Twelfth street; and this being east of Oak street was not under the ban of the order of the police department we have already mentioned. After she had conducted her business in this place for a full month it seems to have become so profitable that the attention of the city, or at least of the police, was attracted to it, and she was placed upon what was described by the plaintiff's attorneys at the trial as a "fine list," which meant that she was required to contribute $25 per month as their profit from the business. At first blush this does not seem like a fair partnership, as the public had to be paid its part irrespective of profit or loss; but when we consider it as an incentive to diligence in the business, its expediency is apparent. Mrs. Johnston testified that while this arrangement continued she had never been haled into court, and that she had never kept a bawdy-house; and no other evidence was introduced contradicting her. This part of the record suggests the story of a woman brought to Him who spake as "never man spake." It is said in the account that He stooped down and wrote with His finger on the ground. The writer has read somewhere a legend that He wrote the names of those responsible for her plight, and who shared its emoluments. Be this as it may, when He arose all the gentlemen present to accuse her had withdrawn, and the two were alone.

As we have already said, these occurrences could have no legitimate connection with the abandonment of her home before the transfer to her father, which was the real and only question for the jury. The court had decided on the trial that it was admissible for no other purpose than to affect her credibility, yet the seventh instruction given for the plaintiff was expressly framed for the purpose of submitting and

did submit that very circumstance for the considera-
tion of the jury in determining whether or not she had
abandoned her homestead; and the modification by
the court of the defendants' fourth instruction could
have had no other object than to prevent them from
submitting that question until impregnated with the
poison of the same testimony. This was of itself
highly prejudicial error.

VIII. In the eleventh instruction given for the
plaintiff the jury were properly told that they were
the sole judges of the credibility of the
witnesses and of the weight to be given
to their testimony. But in addition to
this they were told that in determining such credibility
and weight of the testimony of the witness they *will*
take into consideration "his or her interest, if any,
in the result of the trial, his or her relation to or feel-
ing towards the parties, the probability of his or her
statements, *as well as all the facts and circumstances*
in evidence."

The objectionable character of this part of the
instruction would have been modified to some extent
by the insertion, in the last clause quoted, of the word
*other*, so that it would read, "as well as all the other
facts and circumstances in evidence;" but in a case of
this character, which, as presented in the record, shows
that innuendo and suggestion were largely relied upon
in its presentation, it is hardly proper to so instruct
as to give them full authority to seek information
from unsworn lawyers and neighborhood gossip in-
stead of the legal evidence in the case. But the most
serious objection to this instruction lies in its last
sentence, which tells them if they "believe that any
witness has knowingly and wilfully sworn falsely to
any material fact, you are at liberty to reject all or
any portion of such witness's testimony." This in-
struction is a direct assertion by the court that there

*Instruction on Credibility of Witnesses.*

is evidence to justify them in finding that a witness has wilfully and knowingly sworn falsely to some fact material to the case, and a submission of that issue. We are aware that the courts, including this court, have tolerated instructions of this character on the ground that they have done no harm. When, however, the jury are told that the issue of perjury has been substantially raised in the case and that it is their duty to guess or otherwise ascertain whom it concerns and to what "material matter" it refers, they are invested with a roving and predatory commission dangerous alike to all who are abroad as litigants and witnesses. We see nothing in the record that fairly raises this issue. The witnesses seemed ready to correct their own lapses of memory, and there is nothing in the evidence indicating a wilful effort to misrepresent or suppress any material fact. An example of the character of the insinuation embodied in this instruction is the statement in plaintiff's brief that the testimony of Mrs. Johnston justified it because "she started out by denying that her name was Mrs. Johnston." She simply said that the court at her request had, when she obtained her divorce from Mr. Johnston, changed her name to Lackey, that of her first husband. While there is no suggestion that the records of the court were not available, no competent evidence was introduced to question her. She was only cross-examined with asperity under the mistaken notion that such an order could not lawfully be made unless the "request" mentioned in section 2930, Revised Statutes 1899, was contained in the petition. The other suggestions in aid of this instruction are equally inadequate to justify it. Upon the evidence before us in this record the instruction should not have been given.

IX. Case No. 15613, bearing the same title and involving the same land, was consolidated with this

case for argument and decided at the present. term upon a point which we have not considered it necessary to notice in this opinion.

For the reasons we have given the judgment of the Jackson Circuit Court is reversed and the cause remanded to that court for further proceedings. *Blair, C.,* concurs.

PER CURIAM.—The foregoing opinion by BROWN, C., is adopted as the opinion of the court. All concur, except *Bond, J.,* not sitting,—*Graves, J.,* in separate opinion.

GRAVES, J.—I concur in this opinion except the comment made therein upon the instruction with reference to the credibility of witnesses. I believe that instruction is all right, and I do not agree to the comment made thereon by our learned Commissioner.