# WILBER LEWIS, Appellant, v. SETH S. BARNES.

### In Banc, December 1, 1917.

1. **QUIETING TITLE: Suit in Equity: Cancellation of Deed: Cloud on Title.** An answer asking the court to cancel the deed upon which plaintiff relies to establish his title, as a cloud upon the defendant's title, and a judgment which actually grants this equitable relief, convert the action to quiet title into a suit in equity, and authorize the appellate court to weigh the conflicting evidence.

   *Held,* by FARIS, J., dissenting, with whom BOND, J., concurs, that, in order to entitle defendant to equitable relief and convert the action into a suit in equity, some defense bottomed on well-known equitable grounds must be pleaded, and that a prayer to cancel a deed in plaintiff's chain of title, which in its final analysis amounts only to a contention that defendant's title is better than plaintiff's, does not plead any equitable ground; and the action being one at law, the appellate court cannot settle a conflict on the substantial evidence, but must accept the finding of the trial court sitting as a jury.

2. **FILING DEED: Date as Shown by Index.** The date the deed was deposited in the office of the Recorder of Deeds, as shown by the "Abstract and Index of Deeds" required by law to be kept, determines the date on which the instrument was filed, and not the certificate on the deed reciting that it was "filed for record" on a subsequent date.

*Held*, by GRAVES, C. J., concurring, with whom a majority concur, that a deed is filed for record when it is presented to and left with the Recorder of Deeds for record, and the neglect of the Recorder to actually file or record it cannot defeat the rights of a grantee who has actually left it with him for record, and if the Recorder has wilfully or negligently failed to file and record a deed to a homestead oral proof of the fact of its deposit with him is admissible; and, in an action to quiet title, converted by the answer and judgment into a suit in equity, it will be held by the appellate court that a memorandum on the deed in the handwriting of the Recorder reciting that it had been filed in his office on January 6, 1872, and entries in the "direct" and "indirect" parts of the Index Record showing the same date of filing, show a filing on that date, and such fact is not overcome by a certificate attached to the deed and bearing date of July 19, 1872, in which it was stated the instrument was filed on said July 19, 1872, the Deputy Recorder, who made it, testifying that he did not know how the body of the certificate bore the date of July 19, 1872, unless it was a mistake—it being apparent that the deed was filed January 6th, but was not actually recorded until July 19th.

*Held*, by FARIS, J., dissenting, with whom BOND, J., concurs, that, the cause being an action at law, and the substantial evidence as to the date of the filing of the deed being in sharp conflict, it was for the trial court sitting as a jury to determine its probative force, and his finding that it was filed for record on July 19th the appellate court cannot review; and that the announcement in the main opinion that the direct and cross entries in the Index Record take precedence in comparative probative force over a contrary recital in a solemn sealed certificate made by the Recorder both upon the record and the deed itself, is not in consonance with what has been said by this court in a number of cases.

3. ————: **Homestead: Subject to Sale for Antecedent Debts.** Under the Homestead Act of 1865 the date of filing the deed conveying land actually occupied by the grantee at the time, fixed the date of the beginning of the homestead, which could not be sold by his administrator to pay debts thereafter contracted by him, unless legally charged thereon in his lifetime; and the title to said homestead, upon the death of the homesteader, vested in his widow, subject to the rights of occupancy by his minor children,

and it could not be sold by the administrator, even though so ordered by the probate court, to pay such debts.

4. **HOMESTEAD ACT OF 1865: Liberal Construction: Sale to Pay Debts.** Unless the debt of the homesteader, created subsequent to the time he occupied the land as a homestead and filed his deed for record, was legally charged upon the land during his lifetime, in the manner provided by the laws then in force (G. S. 1865, p. 450, sec. 5), no title passed by the administrator's sale made in pursuance to an order of the probate court to pay the debt; and no strained construction of the law will be made in aid of the asserted title acquired by the purchaser at such sale.

5. ————: **Reforming Mortgage: Abandonment of Lien: Sale to Pay General Debts.** If the homesteader had really intended that an executed mortgage should convey the homestead and had failed to do so because the land was incorrectly described, a proceeding in equity to reform the instrument so as to "legally charge" the land with the debt might have been maintained after the homesteader's death; but, as the statute of 1865 vested the title of the homestead lands in the widow, such a suit could not have been maintained without making her and the minor children parties, and if brought against the administrator alone a judgment pretending to foreclose the mortgage was void. But in this case the facts show that the administrator abandoned his lien, and caused the administrator and probate court to sell the homestead lands to pay general debts, his own among others, and it is now too late for the defendant who claims under said administrator's deed to abandon that claim and claim under an old lien which he never sought to enforce.

6. **LIMITATIONS: Thirty-Year Statute: Strictly Construed.** An acquisition of land in the manner prescribed by the thirty-year Statute of Limitations (Sec. 1884, R. S. 1909) contains no equity that calls upon the courts to be astute in devising ways not directly pointed out by it to support it; the right has no necessary foundation in merit, and he who claims lands under it must look only to the law for support.

7. ————: ————: **Directed to Right to Possession: When Begins to Run: Remaindermen.** The thirty-year Statute of Limitations is directed against such persons only as claim or might claim possession of the land; it does not defeat those who owned the title, but were not entitled to possession. For failure to pay taxes it imposes the penalty of forfeiture against the true owner who was entitled to possession and whose duty it was to pay them, but it does not impose such penalty against him who had no such possessory right as made it his legal duty to pay the taxes.

*Held,* by GRAVES, J., concurring, with whom a majority concur, that it is the duty of the life tenant to pay the taxes, and the law does not impose that duty upon the remainderman.

*Held*, also, that the statute does not begin to run until the person entitled to possession both quits possession and quits paying taxes.

8. ———: ———: ———: Remarriage of Widow: Right of Husband to Possession: Right of Widow's Grantee. The homesteader died in 1873; in 1875 the widow remarried, and her husband died in 1911, and in 1912 she conveyed the land to her only surviving child, the plaintiff, the other child of the homesteader having died in infancy after his death. No lien was legally charged against the land by the homesteader during his lifetime, and therefore under the then statute the title, upon his death, passed to the widow, for the use and occupancy of herself and his children during their minority. The property was sold by the administrator in 1876, under an order of the probate court, to defendant's grantor, to pay the homesteader's debts. At that time it was not encumbered with taxes. *Held*, that after the widow's remarriage her husband was entitled to the possession, and, as the property was then unencumbered with taxes, the thirty-year statute had not begun to run against her, nor did it begin to run against her or her grantee until the husband's possessory right terminated, and since thirty years have not elapsed since then the thirty-year statute will not operate to divest title out of the widow's grantee and vest it in defendant, although he and those under whom he claims have been in possession under the administrator's void deed and have paid taxes for more than thirty-five years.

*Held*, by GRAVES, C. J., concurring, with whom a majority concur, that upon the widow's second marriage, the law separated the whole estate in the land then vested in her, into two estates, namely, the possessory right or life estate of the husband, and the remainder in her, and thereafter the right of possession was in the husband during his life, and the thirty-year statute did not prior to her said second marriage begin to run against her unless she had ceased to pay taxes and had abandoned the possession.

*Held*, also, whether or not the widow paid the taxes prior to her remarriage, she will not be held to have quit the possession until defendant through his void deed claimed the right to possession, and the burden is on him to show that she had sooner abandoned possession, and she did not do that by going away to another state, leaving a tenant in charge and directing her agent to collect the rents and after paying the taxes send the balance to her.

9. **ESTOPPEL IN PAIS.** *Held*, by GRAVES, C. J., with whom a majority concur, that a married woman with no right of possession and no right to sue for possession of land, could not, prior to the Married Woman's Act of 1889, be estopped by acts *in pais*.

Lewis v. Barnes.

10. **LIMITATIONS: Thirty-Year Statute: Possessory Right of Husband: Married Woman's Act.** Prior to the enactment of the Married Woman's Act of 1889, the right to possession of the wife's lands was in the husband, and that right in all lands antecedently acquired was not affected by that act. Said act was prospective in its operation.

11. ————: **Ten-Year Statute: Possession of Administrator.** Adverse possession cannot be founded upon a wrongful taking possession of estate lands by the administrator, even though while it was in his possession it was sold to defendant under a void judgment. The administrator has no title to decedent's real estate, and his official position cannot constitute a claim of title, or furnish a basis for adverse possession.

12. **LACHES: Enhancing Value by Building Railroad.** The true owner cannot be charged with laches for delay in asserting title for that defendant, in his work in promoting and building railroads, had brought these commercial conveniences so close to the land as to greatly increase its value.

Appeal from New Madrid Circuit Court.—*Hon. Frank Kelly,* Judge.

REVERSED AND REMANDED.

*James R. Brewer* and *Wilson Cramer* for appellant.

(1) It is established by the undisputed evidence that the land in controversy was occupied and used by Stephen Lewis and family as a homestead at the time of his death on April 5, 1873, and did not exceed in value the sum of $1500. (2) The deed by which he acquired the land from Wright is dated December 6, 1871, and was deposited for record on January 6, 1872, as shown by the file marks thereon. These file marks are corroborated by the entries in both parts of the "Abstract and Index of Deeds" which state that the deed was filed for record January 6, 1872. The statement in the certificate on the back of the deed that it was filed for record July 19, 1872, is evidently a clerical error. That was the date of recording, as the certificate shows. (3) The "Abstract and Index of Deeds" was a public record. The statute required the recorder to keep in his office a well bound book to be known as the "Abstract and Index of Deeds," containing a direct and inverted index, etc. 2 Wag. Stats., p. 1140, sec. 11, 14, 18. (4)

The attending circumstances raise the presumption that January 6, 1872, is the correct date of the filing of the deed for record. Balance v. Gordon, 247 Mo. 126. (5) Under the statute of 1865 a homestead was not subject to sale under attachment or execution against the head of the family, unless the debt accrued before the homestead deed was filed in the recorder's office for record. G. S. 1865, chap. 111, secs. 1, 7; 1 Wagner's Statute 1872, pp. 697 and 698, secs. 1, 7. The homestead on the death of the husband passed to and vested in fee in his widow. G. S. 1865, chap. 111, sec. 5; 1 Wagner's Stat. 1872, p. 698, sec. 5; Skouten v. Wood, 57 Mo. 389; Gregg v. Gregg, 65 Mo. 343; Rogers v. Marsh, 73 Mo. 68; Grooms v. Morrison, 249 Mo. 551; Armor v. Lewis, 252 Mo. 577. (7) On the death of Stephen Lewis his homestead vested in fee simple in his widow, Drusilla Lewis, subject to the joint enjoyment of his two minor children until they reached their majority, without being liable for the payment of his debts, "unless legally charged therein in his lifetime." G. S. 1865, chap. 111, sec. 5; 2 Wag. Stat. 1872, p. 698, sec. 5; Armor v. Lewis, 252 Mo. 579.

*Oliver & Oliver* and *E. F. Sharp* for respondent.

(1) The sale by the administrator of the estate of Stephen Lewis to John Marr of the land in question passed the legal title to Marr. (a) The debt to Marr was created before the acquisition of the homestead by Lewis. The deed from the Wrights to Lewis was not filed for record until July 19, 1872, while the Marr debt was made January 20, 1872, a full six months before. The homestead dates from the filing of the deed for record. Sec. 7, p. 698, 1 Wag. Stat. 1872; Barter v. Walker, 165 Mo. 30; Shudder v. Girvins, 63 Mo. 394; Tennett v. Pruit, 94 Mo. 145; Payne v. Findley, 165 Mo. 191; Acreback v. Meyer, 165 Mo. 189; Rodgers v. Marsh, 73 Mo. 69; Anthony v. Rice, 110 Mo. 229; Keeline v. Seely, 257 Mo. 514; Sperry v. Cook, 247 Mo. 132. (b) The only competent evidence introduced at the

seal of the recorder and the certificate by the recorder ord is the certificate on the deed under the hand and trial as to the date the Wright deed was filed for rec- made at the foot of the record as required by law; both of these show the deed was filed for record on July 19, 1872. The incompetency of the notation on the front part of the deed was exactly the question before the court in the following case and decided adversely to appellant's contention: Marble Co. v. Ragsdale, 74 Mo. App. 42; Sec. 13 p. 1141, 2 Wag. Stat. 1872. (c) The "Abstract and Index" is no part of the record, and .defendant's objection to its introduction should have been sustained. Bishop v. Snyder, 46 Mo. 479. (d) If, as claimed by the appellant, the record of the deed is wrong, then the recorder is liable to him (appellant) for the alleged error. The respondent is protected by the record as he finds it. Terrell v. Andrew County, 44 Mo. 309; White v. Himmelberger, 240 Mo. 23. Sec. 20, p. 1141, 2 Wag. Stat. 1872, does not require recorder to make any record until fee is paid. No fee paid is shown on back of photograph copy of deed. (2) The debt to Marr not only antedated the filing of the deed from Wright to Lewis but the land was legally charged during the lifetime of Stephen Lewis by the execution of the mortgage, January 20, 1872, to Marr. Lewis was a poor man. His wife states positively that he owned no other land in New Madrid County; Lewis told Toney he had mortgaged this land to pay Marr for the horse; the records of the county show that he never owned any land in section 20 nor any other land in the county and his (Lewis') administrator in his inventory lists this land as having been incumbered with the Marr mortgage in the lifetime of Lewis, and in the mortgage itself all the description is correct except the number of the section, in writing which the scrivener left out a part of the word "twenty-five," writing only the "twenty." The conclusion is irresistible this was a mere clerical error. (a) Under the law as it then was Lewis had a right to mortgage this land, even conceding it was his homestead, without his wife joining therein.

Gladding v. Sydum, 172 Mo. 318. The Marr mortgage was therefore legally charged thereon by Lewis during his life time. (b) This mortgage given by Lewis to Marr was such a lien as could be enforced against this land, notwithstanding the error in the scrivener in failing to write the whole of the word "twenty-five" in describing the section; and being a good and enforcible lien as against Lewis it is equally good against his privies who took with actual knowledge of Marr's right. Black's Law Dictionary, p. 940, title Privies. (3) The pretended claim of the plaintiff is barred by the ten-year Statute of Limitations. 1 Am. & Eng. Ency. Law. (2 Ed.), p. 789. The adverse possession of an administrator may be added to that of a defendant claiming under him. Stotts v. Hanley, 85 Cal. 155. (4) The pretended claim of the plaintiff is barred by the provisions of section 1884, commonly called the thirty-year Statute of Limitations for the non-payment of taxes. Collins v. Pease, 146 Mo. 135; Haarstick v. Gabriel, 200 Mo. 243; Fairbanks v. Long, 91 Mo. 633; Campbell v. Green, 209 Mo. 212; DeHatre v. Edmonds, 200 Mo. 246; Jodd v. Mehitens, 171 S. W. 322; Abels v. Pitman, 168 S. W. 1184; Crain v. Petreman, 200 Mo. 295. The statute began to run on the failure to pay the taxes for the years 1872, 1873 and 1874, and having started to run the marriage of Mrs. Lewis to Burner in 1875 did not toll the running of the statute. The carving out of the two estates in the land occurred after the statute had commenced to run, and as, after her marriage, neither she nor her husband paid the taxes, it continued to run, as to the whole estate. (5) The pretended claim of the plaintiff is barred by laches. Her abandonment of this land was while yet a *feme sole,* as was the notice to her by attorney Hatcher that they were "going to enter suit against this land." Allen v. Moore, 30 Colo. 307; Yates v. Heard, 8 Colo. 343; Kennedy v. Green, 3 Myl. & K. 719; McQuindley v. Ware, 20 Wall. 14; Speek v. Reggen, 40 Mo. 405; Major v. Buckley, 51 Mo. 231. A mere failure to give notice of a right where another without knowledge of the fact is investing his money

and where it might fairly be concluded that he would not have done so if informed of the fact will generally preclude a subsequent setting up of the right thus concluded. Fletcher v. Holmes, 25 Ind. 458. "A person who stands by and' permits another to deal with his property as his own will not be permitted, after the transaction is closed without objection from him, to question it." Peters v. Campbell, 74 Mich. 498; Rice v. Bunce, 49 Mo. 231. Conduct such as the testimony shows in this plaintiff's mother (from whom he deraigns title) has been often held in this State to be a complete bar to recovery. Shelton v. Horrell, 232 Mo. 372; Toler v. Edwards, 249 Mo. 167; Terry v. Grieves, 167 S. W. 569; Cochrell v. Hutchinson, 135 Mo. 75; Rutter v. Caruthers, 223 Mo. 640; Stevenson v. Smith, 189 Mo. 446; Landrum v. Bank, 63 Mo. 56; Bucher v. Hohl, 199 Mo. 330; Kline v. Vogel, 90 Mo. 247; Hudson v. Cahoon, 193 Mo. 562; Moreman v. Tolbert, 55 Mo. 392; Loomis v. Railroad, 165 Mo. 495; Kroenung v. Goehri, 112 Mo. 648; Guffy v. O'Reilly, 88 Mo. 426; Troll v. St. Louis, 168 S. W. 176.

BROWN, C.—This suit was instituted in the New Madrid Circuit Court on June 18, 1912. The petition although a single count contains the usual allegations and prayer for judgment to quiet the title to the west half of the southwest quarter of section 25, township 22 north, of range 13 east, in said county, and also in ejectment for the same land, of which it states that the plaintiff is the owner and that the defendant claims title to the same land by deed from one Stewart, as administrator of the estate of Stephen Lewis, to one John W. Marr, dated August 21, 1876, and duly recorded, which deed he says conveyed no title. The ouster in ejectment was alleged as of June 11, 1912.

The answer claims ownership of the land, denies generally the allegations of the petition not expressly admitted, pleads title by adverse possession for both ten and twenty-four years and also under what is known popularly as the thirty-year Statute of Limitation con-

272 Mo.—25

tained in Section 1884, Revised Statutes 1909. It also denounces the plaintiff's title as having emanated by deed from one Drusilla Burner, formerly Drusilla Lewis, widow of Stephen Lewis, and charges that in 1873 she abandoned the land and had ever since stood by and seen him making valuable and lasting improvements thereon, and expending large sums of money to increase its value, by reason of all of which it has become greatly enhanced in value. It also deraigns paper title through the administrator of Stephen Lewis, as charged in the petition.

No reply was filed, although the parties went to trial on the issues without objection on that ground.

At the trial the parties agreed that one Susannah Wright was the common source of title through a deed to Stephen Lewis dated December 6, 1871, and duly recorded in New Madrid County. This deed recites a consideration of six hundred dollars. The date of its record is questioned. It was made in Indiana, where the grantor and grantee lived at the time, the latter with his wife Drusilla, to whom he had been married in September of the previous year. They were, as respondent stated in his brief, "extremely poor." Upon receiving their deed they packed their little belongings, consisting of some bedding and other household articles, and came to New Madrid, and in the afternoon of the same day of their arrival took the articles they had brought to the little old log cabin on the land in question, about forty acres of which was cleared, where they lived together until the death of Mr. Lewis on April 5, 1873. In addition to their household goods they brought with them to New Madrid County a little girl—a child of Lewis by his former marriage—and while they were living in the cabin the plaintiff Wilber was born. That this place was the homestead of the Lewises under the provisions of the Homestead Law of 1865 (G. S. 1865, p. 449, sec. 1) is not questioned.

The time of the filing for record of the deed from Wright to Lewis is shown in evidence as follows: On its back is the following: "Deposited for Record this 6th day

of January A. D. 1872, John A. Mott, Recorder. Recorded in Deed Book 23, Page 416.'' This endorsement was written by William W. Waters who, at that date, had charge of the office, although he had not been appointed a deputy. After the deed is the following certificate:

"State of Missouri, County of New Madrid—ss. I, John A. Mott, clerk of said court and *ex-officio* recorder in and for said county, hereby certify that the foregoing instrument of writing was filed in my office for record on the 19th day of July, 1872, and the same is duly recorded in Book 23, at pages 414 and 415. Witness my hand and seal of said court hereto affixed, at my office in New Madrid, this 19th day of July A. D. 1872. John A. Mott, Recorder; by Wm. W. Waters, Deputy Recorder. (Seal)''

At the date of this certificate Mr. Waters had received his appointment as deputy. In the "Abstract and Index of Deeds" made under the provisions of section one of the Act of March 25, 1870, the entry in the "front part" arranged in proper columns, was as follows: "Grantor, Wright, S. & F. O.; Grantee, Stephen Lewis, Date of Instrument, December 6, 1871; Date of Filing, January 6, 1872; Nature of Instrument, Deed; Book and Page, Book 23, p. 415; Description, Southwest quarter 25-22-13.'' The "back part" or Grantee's Index shows precisely the same entries.

After the death of Mr. Lewis, Mrs. Lewis lived on the place with the children until December, 1873, when she returned to Indiana, taking the youngest child with her and leaving the little girl in New Madrid County with Mr. Augustine, a neighbor. She afterwards died. After remaining a while at her old home she went to Illinois, where a married sister resided, and where on August 29, 1875, she married one John Burner, with whom she lived in that State as his wife until his death in September, 1911. On June 8th following, Mrs. Burner conveyed the land to her son, Wilber Lewis, who brought this suit.

After his arrival in New Madrid County and on January 20, 1872, Mr. Lewis purchased a horse from John W. Marr for $110, giving his note of that date for the purchase price and executing to Marr a mortgage to se-

cure its payment, which purported to convey the west half of the southwest quarter of section *twenty,* in township twenty-two north, of range thirteen east, in New Madrid County. He had no other land in that county at the time than the tract in suit in section twenty-five. This mortgage was recorded on January 26, 1872. It was not signed by Mrs. Lewis, and she testifies that she knew nothing about it.

At some time in December, 1873, one J. C. Stewart was appointed administrator of the estate of Stephen Lewis, deceased. His bond was filed on the thirteenth day of that month. He inventoried this land, and on the inventory made the following note: "John W. Marr has a mortage on this land for $110, made January 20, 1872; also a mortage to Francis O. and Susanna Wright." No such mortgage as that last described appears in the record. Stewart made his settlement in May, 1880, in which he charged and credited amounts received and disbursed as follows:

"Charges to personal property as shown by the inventory and appraisement.................$55.50
To proceeds of sale of land ...........  .........100.00
Credits by amount of property delivered to the widow ..............................  .. 12.50
Personal property sold under execution......... 43.00
By cost of administration..  ....................49.25
Cost paid John W. Marr on his judgment.... 50.75."

As a voucher he filed the following receipt: "New Madrid Mo., Dec. 22, '73 Rec'd. of Mr. J. C. Stewart all the articles that was appraised at Stephen Lewis place where he died except 7 hogs and one cow that was sold under execution. LEVINE (her mark) LEWIS."

Mrs. Lewis testified that she never knew of the appointment of an administrator, did not know Mr. Levine and never signed any receipt; that she could not write nor read written matter although she could read a little print; that she had never gone by the name of Levine, nor given that as her name.

On August 24, 1874, Mr. Marr brought suit in the New Madrid Circuit Court against Lewis's administra-

tor alone to recover on the note for $110 and to foreclose
the mortgage given on the land described as in section
*twenty* to secure it.   There is nothing in the petition to
indicate that it had anything to do with the land in
question.   Judgment was rendered for the amount of the
note and this judgment is relied upon to sustain the ad-
ministrator's sale pleaded by both parties.   It was al-
lowed by the probate court and assigned to the fifth class.
No attempt is made to rely upon the judgment of fore-
closure, which was evidently void because of the absence
from the proceeding of the parties in interest, and on its
face it does purport to foreclose the equity of redemption
of the owners.

Mrs. Burner testified that when she left New Madrid
County in December, 1873, she paid all the taxes then
charged against the land leaving it clear.   That she left
a tenant on it and also left Mr. Hatcher, a lawyer, in
charge of it, who told her it was clear, and promised to
look after it and pay the taxes out of the rent.   That she
supposed it was going all right until Mr. Hatcher wrote
to her that he was about to institute suit against the land.
That she wrote to him, but never received any further
communication.   That hearing nothing about it she sup-
posed the land was gone.   Mr. Hatcher sent her $18, which
he wrote he received from the tenant.   The land was rent-
ed for $40 per year.   When she left she told Mr. Hatcher
she was going back to her people and wanted him to look
after it, which he undertook to do.

The defendant's counsel, on opening his case, made
the following statement:

"Mr. Sharp: It is admitted that the defendant and
those under whom he claims has been in the actual, open,
continuous, notorious, exclusive and adverse possession
of the land in controversy in this lawsuit since the 21st
day of August, 1876, claiming to be the owners of the
same and that the defendant and his grantors have paid
all the taxes on this land since August 21, 1876, and that
neither the plaintiff nor anyone for him or under whom
he claims paid any taxes on this land in question since
August 21, 1876."

The judgment of the court was for the defendant. The theory upon which it was founded is stated in the following instruction given by the court after having been modified against plaintiff's objection:

"It being admitted that Susanna Wright and Francis O. Wright are the common source of title, the court declares as a matter of law that the deed from Susanna Wright and Francis O. Wright to Stephen Lewis, dated the 6th of December, 1871, introduced in evidence by plaintiff, passed the title to the west half of the southwest quarter of section 25, in township 22 north, of range 13 east, to Stephen Lewis; and if the court shall find from the evidence that he had a wife and minor children and resided with them on said land, using and occupying the same as a home and that the same did not exceed in value the sum of $1500, then said premises constituted his homestead; and if the court shall further find that the said Stephen Lewis died on the 5th day of April, 1873, while so occupying such homestead; leaving his widow, Drusilla Lewis, and two minor children, his homestead passed to and vested in such widow and minor children; that the widow took the same interest in the land that her husband had and the minor children had an interest therein until they, respectively, attained their majority. And the court further declares as a matter of law that, under the homestead law in force in the year 1873, the homestead so vested in such widow and children was not subject to the payment of the debts of said Stephen Lewis, unless legally charged thereon in his lifetime, and that these words mean that there must have been a lien of some kind imposed upon the homestead during the lifetime of said Stephen Lewis, *and the court declares the Marr debt to be a 'lien of some kind' within the meaning of this instruction.*"

The modification by the court consists of the addition of that part italicized in the foregoing copy.

The court also gave, at plaintiff's instance, the following instructions:

"The court further declares the law to be that, if it shall be found from the evidence that Stephen Lewis

was the owner in fee of the west half of the southwest quarter of section 25, in township 22 north, of range 13 east, and used and occupied the same with his family as a home up to the time of his death; that he left surviving him his widow Drusilla Lewis, and two minor children, and that said land did not exceed in value the sum of $1500, then upon the death of Stephen Lewis the same passed to and vested in his widow and minor children, the said Drusilla Lewis becoming entitled by operation of law to the fee simple title, subject to the rights of said minors; that if the court shall find that Drusilla Lewis intermarried with John Burner on the 28th day of August, 1875, the said Burner became immediately entitled by virtue of his marital rights to the possession of the said west half of southwest quarter of section 25 and could alone sue for the possession; that his wife had neither right of possession nor of action during his lifetime, and it being admitted in the record that the defendant did not take possession of the premises until August 21, 1876, after marriage of Drusilla Burner to John Burner, her rights are not affected or impaired by Section 1884 of the Revised Statutes, commonly called the thirty-year statute.

"The Court declares as a matter of law that there is no evidence in this cause showing or tending to show that the equitable title to the premises in controversy emanated from the Government more than ten years before the institution of this suit, or at any time, and that the thirty-year statute therefore has no application and cannot be invoked by defendant in this case."

I. The record conclusively shows that the deed from Susanna Wright and husband to Stephen Lewis was "deposited for record" in the office of the Recorder of Deeds for New Madrid County on January 6, 1872. The law (Laws 1870, p. 111, sec. 1) provided a special record, the "Abstract and Index of Deeds," in which the date was required to be entered by the recorder when it was filed, and the record *then* made was the record of the act done at the time.

Date of Filing.

This is not overthrown merely by a record of the date of the same act not required by law to be made at the time, and purporting to have been made six months afterwards. The last record did not cancel the first. The deed was on file between the two dates as effectually as if the last entry had not been made. The public record made at the time of the act, does not need the strong corroboration afforded by the ordinary file mark on the back of the deed. We are thus relieved from the necessity of further examining the question whether or not this land was exempt from sale by the administrator to pay debts of Lewis contracted before the deposit of the deed for record.

II. In view of the conclusions stated in the preceding paragraph and of the undisputed and indisputable fact that at the time the debt for which **Homestead.** this land was sold and the administrator's deed under which respondent claims title were made, the land in question was the homestead of Stephen Lewis and visibly occupied by himself with his wife and children as such, no title passed under that sale unless the debt had been legally charged upon said land in the lifetime of Lewis as provided by the statute then in force. [G. S. 1865, p. 450, sec. 5.] It is therefore unnecessary to inquire whether, for the purpose of this case, the time of depositing the deed for record, or its date, or the entry upon the land marked the beginning of the inchoate right which culminated at his death. The question is whether the debt to Marr was "legally charged" upon the land in Lewis's lifetime.

Our Homestead Law of 1865 followed close upon the heels of the Act of Congress of May 20, 1862, under which the greater part of the public domain then remaining was devoted to homes for the people who might acquire them under the protection of the Government against all debts contracted prior to the issuance of the patent. It would be difficult to overestimate the advantage to our national citizenship which has flowed from the operation of this law. Our own Homestead Law is

founded in the same broad policy. It not only recognizes to some extent the claims of the wife who has cast her lot with the homesteader and become the mother of his children, as well as those of the infant children themselves, but also takes into consideration the advantage to the creditor of a nucleus around which may be gathered the wherewith to pay his debts. We can see no reason why the language of the law should not be fairly construed in furtherance of its purpose.

The "extremely poor" stand as high before the law as the extremely rich. To observe this equality in its administration it is necessary to take into consideration that while the latter are able to purchase many things, including the solicitous aid of counsel, the former are driven to rely upon that solicitude of the law for justice which can neither be bought nor sold. When Mrs. Lewis was driven in the quest for bread for herself and child, the duty rested upon her to do only what she could to preserve her rights in New Madrid County. She left her little home and such other petty interests as she had, in charge of one who agreed to look after it. It was rented for $40 a year and seems from the evidence to have been worth it, so that its proceeds would have paid her little debt almost as soon as the property was appropriated to a new owner. Under these circumstances there seems to be no reason why a strained construction of the law should be invoked in aid of the title acquired by the debtor.

III. As we have already said, her rights at that time are to be ascertained in answer to the question whether in Mr. Lewis's lifetime his debt to Mr. Marr had been legally charged upon this land. If not, Mrs. Lewis and the minor children took the whole title free from any claim growing out of that debt. [G. S. 1865, p. 450, sec. 5; Skouten v. Wood, 57 Mo. 380; Gragg v. Gragg, 65 Mo. 343; Rogers v. Marsh, 73 Mo. 64; Johnson v. Johnson, 170 Mo. 34; Grooms v. Morrison, 249 Mo. 544; Kelsay v. Frazier, 78 Mo. 111.] The fact that the land was the homestead of the debtor made

*Sale for General Debts.*

a prima-facie case against the validity of the administrator's sale, for at the death of the husband the entire title of which he had been seized vested in the widow and two minor children by force of the statute. They took "the same estate therein of which the deceased died seized," and neither the administrator nor the probate court at his instance had any authority to diminish it. [Balance v. Gordon, 247 Mo. 119, and cases cited and reviewed.]

The trial court held, however, that it had already been diminished at the time of the death of the owner by his attempt to mortgage it, which constituted "a lien of some kind" imposed upon it during his lifetime. This is true in the sense that if the parties to the mortgage intended that it should convey this land and failed by a clerical error of the scrivener, to describe it, the mortgagee might, by a proper proceeding in equity, in a court having jurisdiction, have secured such a correction of the instrument as would "legally charge" the land with the payment of the debt. Had he desired to do this after the death of Mr. Lewis it would have been necessary to make the widow and children, the true owners of the legal title as it then stood, parties to the proceeding and had he then secured his judgment the charge might have related back to the lifetime of the homesteader, and a sale under such judgment might have given the widow and children all the advantages that lie in the sale of a good title, as against the disadvantages resulting from the sale of a possibility, which is not a method favored by our law in the disposition of the property of the innocent and helpless wards of the court. Instead of doing this the debtor ignored the real parties in interest against whom only he was entitled to a judgment charging the debt upon the land and sued the administrator, against whom the court had no jurisdiction to render such a judgment. This was, no doubt, deliberately done, for having obtained a personal judgment against the administrator he presented it to the probate court for allowance in the fifth class, thus waiving and abandoning his lien, rather than to give to the

parties interested notice that he intended to enforce it. The property was sold, not for the payment of any alleged lien, but to pay the indebtedness of the estate and the entire costs of administration. The final settlement of the administrator illustrates this. The entire personal property was inventoried at $55.50, a credit is claimed of $12.50, which the administrator claims to have given the widow upon the evidently spurious receipt, and $43 charged as having been "sold under execution." There is no attempt in the record to explain why or how property of the estate actually in the hands of the administrator could be sold under execution. The one hundred dollars realized upon the sale of the land is accounted for in round figures as follows. The entire costs of the administration $49.25, paid to Marr $50.75, amounting to the even one hundred dollars for which the land was sold, and which had been thus supplied to satisfy the entire costs of administration.

That this sale was absolutely void there can be no doubt. That it was a bungling attempt to obtain the land rather than the payment of the debt is written all over the record. The deed, on its face, left untouched the marital interest of Mrs. Burner, and the administrator divided the proceeds of the sale between himself and Mr. Marr. It is now too late for the present owners to abandon the title they have elected to take and claim under an old lien which they never sought to enforce. It is therefore unnecessary for us to inquire as to the meaning of the Legislature in the use of the words "legally charged thereon in his lifetime," or of the purpose in the deliberate use of the word "legally," since it was discarded in the proceeding.

IV. The real question in this case lies in the attempted application of the thirty-year Statute of Limitation provided in Section 1884, Revised Statutes 1909. This provision is as follows:

Thirty-year Statute.    "Whenever any real estate, the equitable title to which shall have emanated from the Government more than ten years, shall there-

after, on any date, be in the lawful possession of any person, and which shall or might be claimed by another, and which shall not at such date have been in possession of the said person claiming or who might claim the same, or of any one under whom he claims or might claim, for thirty consecutive years, and on which neither the said persons claiming or who might claim the same nor those under whom he claims or might claim has paid any taxes for all that period of time, the said person claiming or who might claim such real estate shall, within one year from said date, bring his action to recover the same, and in default thereof he shall be forever barred, and his right and title shall, *ipso facto,* vest in such possessor.''

It will be seen that it is drastic in its nature and a literal construction of its terms might lead to unthinkable results. There are lands in this State which, for the entire period expressed in that statute, have been considered of so little value and it has been so impossible to make them available as homes or for any purpose of agriculture that the taxes have remained unpaid for a period longer than that expressed in that statute, and which have suddenly attained value from the introduction of modern methods of drainage or otherwise. They then become the easy prey of any speculator who shall alight upon them and hold his possession for one year. It is not necessary under its terms that he should pay the taxes himself. It is only required that he be the first comer and that the true owner should not have observed the changed conditions until he has fastened his claws in the title by a year's possession. It is evident that such an acquisition contains no equity that calls upon the courts to be astute in devising ways not directly pointed out in the statute to support it. The right has no necessary foundation in merit, and the beneficiary himself looks only to the law for support. The statute is only directed against such as claim or might claim the possession of the land. The right of the beneficiary lies in *possession* and the claim which can defeat that right can only be directed against such possession.

A statute of limitations which permits one to obtain title to the wild lands of another by exercising over it possessory acts during one year might amount, in substance, to a legislative act taking the lands of one private citizen and giving them to another without compensation, but we find in the examination of this action that it does not purport to do so, but rather to denounce against the true owner the penalty of forfeiting his land for failure to perform the duty of paying his taxes to the State. To get any added force from this part of the statute we must assume that it was the duty of him who shall or might lawfully claim the possessory right to pay the taxes.

In this case the admission of record is "that the plaintiff, nor any one for him, or under whom he claims, has paid any taxes on this land in question since August 21, 1876." We must therefore assume, taking the record as it is, that when Mr. Marr took possession on August 21, 1876, he did not take it encumbered by unpaid taxes and that the thirty-year statute began to run against whoever was then entitled to possession. [Hall v. French, 165 Mo. 430.] In that case this court, In Banc, said (page 442): "No court has ever held that a right can be barred by limitation before the law permits the owner of the right to come into court, for such a decision would be a solecism, a denial of due process of law, for it would not give the party 'a day in court.' If a remainderman came into court before the life estate had terminated, he would be turned out of court because his cause of action had not accrued. If he did not come into court within thirty years from the time the life tenant, or tenant for years, or tenant by the curtesy went into possession of the qualified estate, he would be turned out of court because he came in too late, albeit, his right of action had not then accrued. No such construction has ever been or could ever be placed upon section 4268, Revised Statutes 1899, and if that section was intended to prescribe any such rule of conduct it would violate the Constitution of Missouri as well as the Constitution of the United States, for it would deprive a

person of his property without due process of law—
without giving him a day in court.''

The doctrine so vigorously applied to this statute
in that case is still unshaken and is as applicable in this
case as to the one then before the court. No adverse
entry upon the possession of Mrs. Lewis and the chil-
dren was made until Marr entered in 1876 under his void
administrator's deed. In the meantime Mrs. Lewis had
been married to Burner who, by that act, became, by
virtue of his marital rights, entitled to the possession of
the land in controversy for which he alone could sue.
The estate of the children derived directly from their
father, terminated with the majority of one and the
death of the other, upon which whatever right of pos-
session existed in them also passed to Burner in right
of his wife. [Hall v. French, supra; Vanata v. John-
son, 170 Mo. 269; Graham v. Ketchum, 192 Mo. 15.]
It was held in Graham v. Ketchum, supra, that the right
of the husband to the possession of his wife's land ac-
quired before the enactment of the Married Woman's
Act of 1889 is not affected by the provisions of that act
permitting the wife to sue as a *feme sole*. In other
words, that act was prospective and as to all property
acquired by the husband before its passage his rights
remain as they were at common law and in this State
before the act was passed. This, the court said, citing
Vanata v. Johnson, was the settled law of the State.
That principle can, however, have no application to the
running of the thirty-year statute in this case, for only
twenty-two years elapsed between the taking effect of
that act and the institution of this suit. We hold there-
fore that that statute has no application to this case.

V. The respondent contends that the action is
barred by the ten-year statute, because the latter began
to run immediately upon the death of Lewis,
upon the theory that there was a constructive
possession of some sort in the administrator
adverse to the title of the widow, and to which
her disability could not be tacked. Having started the

Ten-year
Limitation.

statute, like the cork leg immortalized in the old ballad, it could not stop.

There is nothing in this point that requires further elucidation than its bare statement. That the administrator takes no title to the real estate of the decedent is fundamental; and his official position cannot therefore constitute a claim of title. His connection with the possession is confined to obedience which he must yield to the direction of the probate court, which is the mouthpiece through which the law speaks to him. The right remains with those to whom the law gives it. He represents the personal estate only, and has no power to expend a dollar of it upon the repair or maintenance of the realty otherwise than upon the order of the court. [Thorp v. Miller, 137 Mo. 231-239, and cases cited.] It would be preposterous to say that his assertion of right, whether by word or act, could start in motion the Statute of Limitations against every infant having an interest in the ownership, and divest its title by mere delay in the performance of his duties. The respondent cites Spotts v. Hanley, 85 Cal. 155, in support of this position. We see nothing in that case affecting the question before us. It arose under some law of California which under the circumstances gave the right to the administrator to sue in ejectment to recover the possession of the premises, and it was held that the judgment in his favor was an adjudication that the possession of the tenant as against him was wrongful from the date of the beginning of the action up to the time of its rendition, and inured to the heir whom the administrator represented in the suit. It lends no support to the theory that under our law the administrator had a possessory right which he may use by mere delay to defeat the title of the heir.

VI. The question of laches (or estoppel) as presented by this record does not recommend itself to our consideration. We have already suggested that **Laches.** it is the glory of our system of equity jurisprudence that the poor approach its tribunals on the same level as the rich. To maintain this equality it is necessary that the condition of the litigants in that

respect be taken into consideration; for it would be a poor system that would require the impossible as a condition of justice. This defense is founded upon the fact that Mrs. Burner "stood by" during the entire period of occupation by Mr. Marr and his successors in title, and possession, and saw them, without complaint or interference, expend large sums of money by which the value of the land has been greatly increased. The principal specification dwelt upon by respondent is that in his work connected with the promotion and construction of railways, which has been otherwise profitable to him, he has brought these commercial conveniences so close to this land as to increase its value greatly; and counsel dwell upon the injustice of permitting Mrs. Lewis to classify herself with the beneficiaries of his success. She should be satisfied he thinks with the small fraction of her little investment which enabled her to get back to her friends empty handed, leaving the fruits of the future prosperity of the country to those able to remain and take care of their own.

When necessity required that Mrs. Lewis should leave New Madrid County she did all she could to leave her little interests in safety. She procured a tenant for her land at $40 per year, paid her taxes and employed a lawyer to look after it, to whom, we must assume, she paid his reasonable charge for the service; and this assumption is supported by the fact that he afterward sent her $18 from the rental. Her condition afforded no evidence that she could return to look after it. It was a good riddance to those who afterward intervened in their own interest. In shaking her off the lawyer who had promised to take care of her wrote her that he was about to bring suit against her land. On receiving this information she naturally gave up everything as lost. She wrote to him, but received no answer. In bringing suit he was so considerate as to leave her and her children out, so that courtesy was satisfied without sending her a copy of the notice. This, we must assume from the scant evidence before us, was the same suit in which the judgment, void as to her, and which now furnishes the foun-

dation on which respondent's paper title rests, was entered. She had been successfully eliminated from the scene of action. Her poverty necessarily eliminated her as a disturbing element in the subsequent proceedings, which moved tranquilly forward to the consummation in which respondent's claim consists. He now complains that she made no active effort to assist him. He needed no notice, for the facts were plainly indicated in every phase of the transaction which constituted his claim. To hold that this woman should have looked from her Illinois home to New Madrid County and observed the plight of respondent and protected him in this purchase, when all the instrumentalities of self-protection lay at his hand, would be an indulgence in legal fiction entirely disconnected from any principle of law or justice. It is impossible to read this record without surprise that during thirty-five years devoted to the handling of this title none of the parties interested have recognized the propriety of seeking the aid of Mrs. Burner to protect it.

VII. One other matter has been so strenuously urged as to call for notice. Notwithstanding the stipulation at the trial fixed August 21, 1876, as the date of the origin of respondent's claim and the beginning of the neglect of Mrs. Burner to pay the taxes, there is evidence that the trial court will be presumed to have considered that that neglect began as early as 1873. We do not so understand the record. The contention is founded upon the testimony of one Dawson, who was collector from 1873 to 1876, who now has the tax books which constituted his process for the collections of those years; that it was his custom to mark "paid" opposite the charges as they were paid, and that word does not appear opposite the several entries as to this land until 1876, when Mr. Marr paid the taxes. He refused to state his belief that they were not paid and he was right in so refusing, because in that case it would have been his duty to return them as delinquent and collect them, and the fact of their delinquency would be a public record of the county. He says that Mr. Marr paid the taxes of 1876. If the land stood

*Evidence of Payment of Taxes.*

272 Mo.—26

charged with previous taxes he could only clear it by paying them also. We do not think that, in the absence of explanation, Mr. Dawson's testimony constitutes any evidence of the non-payment of these taxes. We think that in the absence of such explanation the only inference that can be drawn from the facts so stated is that they were paid, and that is evidently the inference which Mr. Dawson himself drew.

We think that complete justice can be done between the parties in a trial of this case in accordance with the principles herein stated. We accordingly reverse the judgment of the trial court, and remand the cause for further proceedings.

*Railey, C.,* concurs.

PER CURIAM:—The foregoing opinion by Brown, C., is adopted by the Court in Banc as the opinion of the court. *Woodson, J.,* concurs, *Graves, C. J.,* concurs in a separate opinion in which *Williams, Woodson, Blair* and *Walker, JJ.,* concur. *Faris, J.,* dissents in opinion filed, in which *Bond, J.,* concurs.

GRAVES, C. J. (concurring)—This case had been a source of trouble to me since its resubmission in Banc. The learned dissent of our brother Faris has been the cause of my reinvestigating the record. I cannot conclude that this case is a case at law. The answer in this case carried it to the equity side of the court. Going to that answer we find a plea of estoppel *in pais,* which under some circumstances might be equitable. But leaving out this portion of the answer there is an attempted plea for the reformation of a mortgage (the mortgage from Lewis to Marr) and in the trial of the case evidence was admitted on that plea. But leaving this question out, the answer after detailing all the facts asks the court to cancel of record the deed of Mrs. Burner to Lewis, the plaintiff, as a cloud upon defendant's title, which is an affirmative equitable defense, and what is more, the judgment (see short-form transcript filed here) actually grants this equitable relief and cancels of record this deed because a cloud on defendant's title. The case is therefore one in equity,

*Suit in Equity.*

both by the pleadings and the judgment. Our learned Commissioner did not state the facts as fully as might have been done and our learned brother was no doubt misled thereby.

II. The case being in equity the first matter of import is the question whether or not this was the homestead in Lewis's lifetime. The evidence is all one way on this question. He and his family, consisting of a wife and two children, lived there from January, 1872, until June, 1873, when he died. The next question is whether or not the deed to this homestead was filed for record before the debt to Marr was created. Upon this point I fully concur with the commissioner. The case being in equity we have the right to review this evidence. It was shown that in the handwriting of the Recorder of Deeds was a written memorandum that the deed was filed in the Recorder's office on January 6, 1872. This is what might be called the file mark of the officer on the instrument when presented for filing and record. The Index Record and the cross record thereof both show the same fact, and the only thing contra is the certificate of the Recorder made by the Deputy Recorder, which certificate says the deed was filed for record and recorded on July 19, 1872. On the other hand the Deputy Recorder was a witness, and when being shown all these memoranda, and asked how the body of this certificate happened to have the date July 19, 1872, he said he didn't know unless it was a mistake. To my mind it is clear. The deed was evidently filed January 6, 1872, but the deed not actually recorded until July 19, and when the deputy made this certificate on the deed he made it as of that date. I am satisfied that we should in all good conscience hold that this deed was filed for record January 6, 1872. How much further trouble this holding portends in this, a cause in equity, remains to be seen.

But going a bit further on the proof as to the filing of this deed. It must be remembered that it is the filing of this deed with the Recorder, that fixes the homestead right as against debts. [1 Wagner's Statutes, sec. 7, p.

*Date of Filing.*

698.] It is not the actual record of the deed, but the actual "filing" which fixes the rights. When a deed is presented to and left with a Recorder of Deeds for record, it is "filed" for record, whether there is a mark made thereon or not. The neglect of the officer to actually file or record the same could not defeat the rights of a party who had performed his full duty by actually leaving the deed with the recorder for record. We suggest these things, because they show the character of proof which may be made of this act of "filing." I have no doubt that if the Recorder had willfully or negligently failed to file and record a deed to a homestead, oral proof of the fact of the deposit of the deed for record would be admissible. Any competent evidence to show this deposit of the deed for record should be heard. But in this case we have the actual file mark of the Recorder, signed by the Recorder (the index and cross index), required by law to be kept, showing the date of filing, and nothing contra but the certificate of record, which as to the date of filing is evidently a clerical error.

III. If the deed to this homestead was filed on January 6th, as I feel that we must hold, the defendant has no valid paper title. Upon the death of Lewis the title passed in fee to his widow (subject of course to the rights of the children, and one of them is dead and the other long since of age), and her deed to the plaintiff carried to plaintiff the legal title in fee.

We then come to the defense of estoppel *in pais*. No act constituting the chain of evidence on this question occurred until long after Mrs. Lewis had remarried in 1875, and her husband became entitled to the possession of these lands. This status was not disturbed by the Married Woman's Act. [Leete v. State Bank, 115 Mo. 184.] This right of possession remained with the husband until his death in 1911. In addition to this, knowledge of these acts was not brought home to the woman prior to the death of the husband. The question is, can a married woman, who is not even entitled to sue for possession, be estopped by acts *in pais,* and which acts have not been brought to her knowledge? Simplifying the question,

can a married woman with no rights of possession and no rights to sue for possession, be estopped by acts *in pais?* We think not, and in so answering we do not consider the question of her knowledge or want of knowledge of said acts. Estoppel proceeds upon the theory that the party had failed to act, when he should have acted. In this case the woman could not act. She could not sue for possession. Her hands were tied by the law, and it would be an injustice to say that she should be estopped by a state of facts which she could not prevent. She could neither sue for the possession nor prevent acts against the possession. Her marriage was prior to the Married Woman's Act, and upon marriage the rights of possession and all incidents thereto passed to the husband, and in such possession he had a vested right, which was not disturbed by the later Married Woman's Act. There is nothing in the plea of estoppel in this case, however harsh the case may be for defendant.

IV. Nor is there force in the contention of the defendant as to the thirty-year Statute of Limitations, section 1884, Revised Statutes 1909. This is an affirmative defense and the burden of proof is on defendant. There is a dispute about the payment of taxes in 1873. Dawson, the collector, says the books show that the taxes were not paid for the years 1873, 1874 and 1875. The widow swears that she paid the taxes for the year before she left the State and that she rented the land for $40 per year to a tenant, whom she left in possession, and that Mr. Hatcher, who was attending to her business for her, sent her $18 out of the rent and she thought he was paying the taxes. But we may pass this matter by, and concede that the taxes were not paid. This thirty-year statute does not begin to run until the party quits the possession and quits paying taxes. In other words, as long as the widow in person or by her tenant was in possession, the mere failure to pay taxes did not start the statute to run. Her possession continued until after her marriage, or at least the defendant did not show her out of possession until the year 1876, when Marr took possession. The defend-

ant's evidence fails to show that the widow was out of possession prior to December, 1876. The statute, therefore, did not begin to run during the time she was *feme sole,* and could not run when she became covert, as we shall undertake to show.

Mrs. Lewis married Burner in August, 1875. Upon this marriage, the law then separated this whole estate into two estates, (1) the possessory, or life estate of the husband, and (2) the remainder in the wife. The life estate carried with it the duty to pay taxes. This duty was not imposed by law upon the remainderman.

In the case of Hall v. French, 165 Mo. 1. c. 442, a case where by deed, the whole estate had been carved into two estates, i. e. one for life and one in remainder, this court held that the thirty-year Statute of Limitations could not apply, and to apply it would be to deprive the remainderman of his property without due process of law. Not only so, but we held that this division of the whole estate into two estates might be by operation of law (as in the instant case) as well as by deed. That case says that "Section 4268, Revised Statutes 1899, has no application to the case at bar," and it has never been overruled. The writer had occasion to review this statute and our previous holdings in De-Hatre v. Edmonds, 200 Mo. 1. c. 280, and preceding pages. We distinguished the Hall-French case, supra, from the DeHatre case, but expressly recognized the doctrines of the Hall-French case. We thus said: "In our judgment if the two estates had been carved from the whole, either by deed or *operation of law,* prior to the beginning of the adverse possession, and the payment of taxes, then section 4268 does not apply, except as to the possessory estate. In other words, does not apply to the remainderman. But on the other hand, if the adverse possession and the payment of taxes began prior to the carving out of the two estates from the whole, then such statute does apply, and as to the whole estate."

In the instant case the two estates were created by operation of law before there was any delinquency in

the possession. The duty to pay future taxes was upon the life tenant and not upon the remainderman. The thirty-year Statute of Limitations does not apply to the remainderman, as was expressly ruled in both of these cases. I see no good reason to change the rule. I therefore concur in the opinion of the learned Commissioner in so far as it does not conflict with these views, and concur in the result of his opinion. *Williams, Woodson, Blair* and *Walker, JJ.,* concur in these views.

FARIS, J. (dissenting)—I find myself unable to concur with the views of our learned Commissioner in this cause.

It is elemental, I premise, that this is either an action at law, or it is an action in equity. If it is an action in equity, the doctrine of laches operating on an abandonment, with *scienter* of all the facts, existing through a period of 38 years, coupled with the making of vast and valuable improvements and an increase in value of the premises in dispute from $200 to $18,000 would seem to have had the effect of extinguishing the title of plaintiff. [Shelton v. Horrell, 232 Mo. 358.] If it is an action at law, then the findings of the learned trial court on disputed questions of fact in a jury-waived case are conclusive on this court when such findings are supported by any substantial evidence (Woods v. Johnson, 264 Mo. l. c. 293; Hatton v. St. Louis, 264 Mo. 634; In re Lankford's Estate, *ante,* p. 1; Chilton v. Nickey, 261 Mo. 232), and in any such case, absent error in admitting evidence, or in giving or in refusing declarations of law, the case must be affirmed.

There is scant doubt that the case is one at law; so we need not concern ourselves as to the laches contended for. It was a contest between legal titles solely, and no equitable relief was decreed by the judgment *nisi.* Plaintiff asserted no equities and had no equities to establish. He either has a legal title, or he has no title whatever. Defendant either has a legal title by virtue of the Statute of Limitations, or a title deraigned through the sale to his

Equitable
Defenses.

mesne grantor under orders of the probate court, or he has no title of any kind. While defendant in his answer prayed the court *nisi* to cancel as an alleged cloud upon defendant's title, the deed from plaintiff's mother to the plaintiff, being the identical conveyance through which the latter claimed the legal title to the land in dispute, such a mere empty claim in the form of equity is not sufficient to invoke that jurisdiction. Defendant, in order to entitle him to equitable relief and convert the action into one sounding in equity, must plead some defense, or some claim to affirmative relief, bottomed on some one of the well-known grounds upon which equity assumes jurisdiction. Here the deed of which defendant sought cancellation was merely a conveyance in plaintiff's chain of title, which evidenced a claim of title adverse to that asserted by defendant. The only grounds urged for such cancellation were legal grounds, bottomed upon the contention, in the last analysis, that defendant's legal title from the agreed common source is better than that of plaintiff. It is elementary that equity will not assume jurisdiction under these conditions. If equity could be made to take jurisdiction under such facts, every action in ejectment can willy-nilly be thrown into equity by the simple expedient of praying relief (by way of cancellation) against all conveyances evidencing the adverse chain of title.

It is also true that defendant's answer contains abortive and wholly irrelevant recitals, touching a mortgage on the land in controversy. This mortgage it is averred was executed in 1872, but it contained an error in the description of the land. The pertinent recitals in the answer, as likewise does the evidence offered upon the trial, show conclusively that this mortgage is not in defendant's chain of title; that he is not claiming under it and could not claim under it if he desired to do so. Foreclosure, subrogation, reformation and the lien of it, if any there ever was, have all been outlawed by the Statute of Limitations for almost a quarter of a century. Defendant merely recites, seemingly as a sort of sentimental defense, the fact that a mortgage was at-

tempted to be executed, but such execution failed on account of an error in describing the land. He neither recites facts warranting reformation or foreclosure or subrogation, nor does he pray for any such relief, nor was he upon the facts averred entitled to any such relief, if he had prayed for it.

Granting, at least for the argument's sake, that defendant could not have been heard to complain if the trial court had seen fit to regard the action as one converted into equity by wholly insufficient and irrelevant cross-bills, it is enough to say upon this head, that it was tried below as a suit at law. The learned court *nisi* obviously so regarded it because he gave numerous declarations of law. Learned counsel for plaintiff obviously so regarded it below and so regard it here. For they requested and the court gave many declarations of law upon the trial, and the only errors they have assigned here are bottomed upon the court's giving alleged bad and refusing good declarations of law. We must assume that both the court *nisi* and counsel are not unaware of the settled rule that declarations of law and instructions have no place in an equity suit. No citations are necessary, for the cases are legion, wherein we have ruled that this court upon an appeal is irrevocably bound by the theory upon which a case is tried below. So, in this case there is no room for the doctrine of laches. [Chilton v. Nickey, supra; Leslie v. Carter, 240 Mo. 552; Troll v. St. Louis, 257 Mo. 626; Stanton v. Thompson, 234 Mo. 7.]

*Questions of Fact.*

Plaintiff, being cast *nisi*, had cast on him here the burden of proving harmful error, before we are authorized to reverse the case.

The only errors assigned or complained of, are three, all having reference to the alleged erroneous modification of one instruction, and to the refusal to give two other instructions, which plaintiff offered *nisi*.

I. The court modified an instruction prepared and offered by plaintiff by adding thereto the words "and

the court declares the Marr debt to be a lien of some
kind, within the meaning .of this instruction."
This instruction as modified, with the modifica-
tion italicized, reads thus:

**Prior Debt.**

"And the court further declares as a matter of law
that, under the homestead law in force in the year 1873,
the homestead so vested in such widow and children
was not subject to the payment of the debts of said
Stephen Lewis, unless legally charged thereon in his
lifetime, and. that these words mean that there must have
been a lien of some kind imposed upon the homestead
during the lifetime of said Stephen Lewis, *and the court
declares the Marr debt to be a 'lien of some kind' within
the meaning of this instruction.*"

Was this addendum reversible error? I think not.
If the court found (a) that Stephen Lewis filed his deed
to this alleged homestead on July 19, 1872, and (b) gave
his note for $110 to Marr for the purchase price of a
horse on January 20, 1872, or at any time prior to filing
his deed for record, then the debt for which the land
was sold was a debt contracted before the land became
a homestead, and one for which such homestead could
be sold. [Sec. 7, p. 698, 1 Wagner's Stat. 1872; Acreback
v. Myer, 165 Mo. l. c. 685; Barton v. Walker, 165 Mo. l.
c. 30; Payne v. Fraley, 165 Mo. 191; Keeline v. Sealy,
257 Mo. 498; Sperry v. Cook, 247 Mo. 132.] But citations
of authorities are stale and unprofitable, for the *statute
in force in the year 1872, at the identical time* at which
this homestead was acquired, read thus:

"Such homestead shall be subject to attachment and
levy of execution upon all causes of action existing at
the time of the acquiring such homestead, except as here-
in otherwise provided; and, for this purpose, such time
shall be the date of the filing in the proper office for the
records of deeds, the deed of such homestead, and (in
case of existing estates) such homestead shall not be
subject to attachment or levy of execution upon any lia-
bility hereafter created." [1 Wag. Statutes, sec. 7, p.
698.]

As the learned trial court might well have found,
and evidently, as he did find, the land was sold by the

administrator under an order of the probate court to pay the debt due to Marr, which debt was contracted on the 20th day of January, 1872, some six months before the deed was recorded. This land was not sold under the defective mortgage given to Marr by Stephen Lewis, in the latter's lifetime. Obviously this was because the erroneous description of the land would have made a sale under this mortgage absolutely void, unless and until the mortgage had been reformed in equity. Marr, the owner of the note which evidenced the above debt, obtained judgment thereon in the circuit court, in March, 1875, and likewise procured in the said circuit court a decree of foreclosure of this defective mortgage. Subsequently, and in May, 1875, Marr filed this judgment in the probate court; had it classified, and thereon later procured an order of sale of the land to pay said judgment debt; following which in due course and duly, as the record discloses, the land was sold, and being stricken off to Marr, a proper administrator's deed was made to him, which deed is in defendant's chain of title. The void mortgage, the judgment of the circuit court, and the abortive decree of foreclosure performed no office here, save and except that they identify beyond dispute the debt for which the land was sold, as being one made on January 20, 1872.

From this it is manifest that the instruction set out above, and which the court modified, was, as offered by plaintiff, absolutely erroneous, for that it did not state the true facts. For when the record is read it appears beyond dispute that there is no mortgage, or mortgage lien in the defendant's chain of title. When the instruction, *as it was offered by plaintiff*, mentions a lien, it seemingly attempted in a far-fetched way to follow the then provisions of section 5, p. 698, of Wagner's Statutes of 1872 (although said section does not contain the word "lien"); whereas the record was utterly barren of facts to bring the case within the purview of the above section. And at the same time this original instruction ignored the provisions of section 7, p. 698, of Wagner's Statutes, when the record was full of facts to bring it within the purview of the prior existing debt provision of the latter

section, and when such facts were the only facts in the record referring to a debt of any sort.

While therefore the learned trial court would have been justified in refusing this instruction outright, he chose to modify it, and being misled by the plaintiff's inaccurate use of the word "lien," instead of the word "debt," he himself followed this inaccuracy and used in his modification thereof the technical word "lien," where he should have used the broader term "debt." He had the right both under the law and the facts to consider whether the note made to Marr, on January 20, 1872, was *such a prior debt* as under the provisions of section 7 of Wagner's Statutes supra, deferred till its payment, the vesting of a homestead in the widow. So, I am of the opinion that since this modification, while technically inaccurate, was induced by plaintiff's own error, and since it can in no way alter or change the result in this case, under the beneficent provisions of section 2082, Revised Statutes 1909, it is not reversible error.

Upon both of the above controlling questions of fact, especially the first (there is little dispute, and no place for any dispute as to the second), there was conflict in the testimony. No one can assert in the light of this record that there is not substantial testimony to uphold the view manifestly held by the trial court, that the Marr note was a debt within the provisions of said section 7 of Wagner's Statutes. The law is settled, I apprehend, that in a case at law where no instructions are asked or given, or where those which are refused were either properly refused for inherent defects, or because they turned upon disputed questions of fact, the finding of the trial court imports precisely the same verity as a jury's verdict. [Woods v. Johnson, supra; Hatton v. St. Louis, supra.] The modification of the above instruction (the slight technical inaccuracy being disposed of) was warranted or unwarranted, according as the trial court may have found the two questions of fact set out above.

II. The trial court refused to give the below instructions requested by plaintiff, to-wit:

"2. The court further declares the law to be that the vesting of a homestead in the widow and minor children as set out in the foregoing declaration No. 1, is not dependent on the filing in proper office for the record of deeds the deed of such homestead, and that, as to them, it is immaterial whether such deed be so deposited before or after the incurring of a debt by the husband subsequently to the acquiring of such homestead; that if the court shall find from the evidence in this cause that Stephen Lewis became indebted to John W. Marr by note on the 20th day of January, 1872, the homestead of the widow and children vested in them by the death of Stephen Lewis on the 5th day of April, 1873, was not subject to sale for the payment of such debt, although the court may further find that the deed to such homestead was not filed for record until July 19, 1872.

*Homestead: Prior Debt.*

"3. The defendant having offered in evidence as the source of his title, an administrator's deed, dated August 21, 1876, from J. C. Stewart, as the administrator of the estate of Stephen Lewis, deceased, to John W. Marr, made in pursuance of an order of sale of the probate court for the payment of debts of the said deceased, the court declares as a matter of law that it was incumbent on the defendant, for the purpose of showing jurisdiction in the probate court to order the sale of the homestead of the widow and children of Stephen Lewis, to establish in this cause that the debt for the payment of which such sale was so ordered was incurred by said Lewis prior to his acquiring such homestead, and defendant having failed to offer any evidence proving or tending to prove such fact, said administrator's deed is insufficient and ineffectual to show title in John W. Marr to the premises in controversy."

Instruction 2, supra, was palpably erroneous, unless both the statute which we quote and the written construction thereof by this court have been wrong for forty-five years (Sec. 7, p. 698, vol. 1, Wag. Stat. 1872;

Barton v. Walker, 165 Mo. l. c. 30; Payne v. Fraley, 165 Mo. 191; Acreback v. Myer, 165 Mo. 685; Tennent v. Pruitt, 94 Mo. 145; Berry v. Ewing, 91 Mo. 395; Clark v. Thias, 173 Mo. 628; O'Shea v. Payne, 81 Mo. 516; Creath v. Dale, 69 Mo. 41); hence, it was properly refused and error cannot be bottomed on such refusal. Indeed, appellant in his brief does not question the law on this point; he merely takes issue with the facts. But these facts, as we have seen, were for the trial court.

In substance instruction 2 declares that the homestead vested in the widow free from the liability of being sold for a debt contracted by the husband in his lifetime and prior to the filing for record of the deed of conveyance to the husband of the land claimed as a homestead. It was held otherwise in Vermont before we adopted the law of that State on homestead (Simonds v. Powers, 28 Vt. 354; Perrin v. Sargeant, 33 Vt. 84; White v. White, 63 Vt. 577), and we have always followed the same view, which view is directly in the face of the refused instruction, as the refused instruction is directly in the face of the statute then (in 1872) and now in force. [Sec. 7, p. 698, vol. 1, Wag. Statutes; Sec. 6711, R. S. 1909.] It follows that no reversible error can be bottomed on the refusal to give instruction 2.

III. Coming to the only other ground of alleged error found in the case or urged in the brief, it will be seen that instruction 3, which the court refused to give for the plaintiff (in addition to the fact that it is in diametrical conflict with instruction 2, supra), likewise depends for its goodness upon a sharply disputed question of fact. If the court *nisi* found that there was evidence tending to prove that a debt to Marr had been incurred before Stephen Lewis filed his deed for record, then he was right in refusing to give this instruction. Upon this phase we have seen that the trial court, on the question of resolving this contradiction, sat as a jury sits; hence, we cannot disturb his finding of facts; and since his finding of facts dominates wholly the question of error *vel*

*Recording Deed.*

*non* for refusing this instruction, his action in refusing it was not error. Even if this were not true, we have already seen that refused instruction 2 is diametrically in conflict with refused instruction 3. If the date of the filing for record of the deed of conveyance to a homestead is the date of acquiring such homestead, then this instruction was properly refused on this ground alone. That such date is controlling, all of the authorities agree, and our statute itself provides. [Sec. 7, p. 698, Vol. 1, Wag. Statutes, and cases cited supra; Shindler v. Givens, 63 Mo. 394; Osborne & Co. v. Evans, 185 Mo. 509; Sec. 6711, R. S. 1909.]

The above discussion comprehends all of the errors which are urged, or which can be urged upon this record for a reversal thereof. I submit that they are insufficient, and that this case ought to be affirmed.

In passing, I pause to observe that there is much said in the majority opinion with which I do not agree, touching the so-called thirty-years Statute of Limitations, and of the comparative probative weight of the index of deeds, when contradicted by the solemn sealed certificate of record made by the Recorder, both upon the record and upon the deed itself. I think our learned Commissioner's conclusions upon the former point are in divers particulars opposed to what has been said by this court in the well considered cases of Abeles v. Pillman, 261 Mo. 359; Collins v. Pease, 146 Mo. l. c. 139; Rollins v. McIntire, 87 Mo. 496; DeHatre v. Edmonds, 200 Mo. 246; Land & Imp. Co. v. Epright, 265 Mo. 210; Campbell v. Greer, 209 Mo. 199, and that his views upon the latter point are not in consonance with what has been said by this court in the case of Bishop v. Schneider, 46 Mo. l. c. 479, and by Division Two of this court in Keyes v. Munroe, 266 Mo. l. c. 116, and by the St. Louis Court of Appeals in the case of Marble Co. v. Ragsdale, 74 Mo. App. 42, but since the views which I express above, and which I am constrained to take of the law of the case, fully dispose of it, I need not take up further space than merely to record the fact of my non-concurrence in the behalves mentioned. *Bond, J.,* concurs in these views.